978 F.2d 786
 UNITED STATES of America, Appellee,
v.
Duane MARKIEWICZ, a/k/a Donald Markiewicz, a/k/a Don Marks;
Brenda Kane; William Beglen; Otatdodah Homer;
John Kane; and Linda Markiewicz, a/k/a
Linda Marks, Defendants-Appellants.
 Nos. 798, 709, 809, 704, 568 and 710, Dockets 91-1077 to
91-1081 and 91-1135.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 27, 1992.
Decided Nov. 3, 1992.
 
 Joseph Douglas Wilson, Washington, D.C., Asst. U.S. Atty., U.S. Dept. of Justice, Washington, D.C. (Frederick J. Scullin, U.S. Atty., John J. Brunetti, Asst. U.S. Atty., N.D.N.Y., of counsel), for appellee.
 Bruce R. Bryan, Syracuse, N.Y., for defendant-appellant Brenda Kane.
 John A. Cirando, Syracuse, N.Y., for defendant-appellant William Beglen.
 William M. Kunstler, New York City, for defendant-appellant John Kane.
 J. Scott Porter, Syracuse, N.Y., for defendant-appellant Otatdodah Homer.
 Kate Rosenthal, Syracuse, N.Y., for defendant-appellant Linda Marks.
 Douglas G. Roberts, Syracuse, N.Y., for defendant-appellant Donald Marks.
 Before: WINTER, PRATT and MAHONEY, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 The six defendants before us challenge their convictions after a jury trial in the United States District Court for the Northern District of New York, Howard G. Munson, Judge.
 
 
 1
 The principal issue on this appeal is whether the district court had jurisdiction over those crimes that were committed by the Indian defendants. Five of the appealing defendants--William Beglen, Otatdodah Homer, Brenda Kane, Donald Marks, and Linda Marks--are Oneida Indians. The sixth defendant, John Kane, is a Mohawk Indian. Most of the events relevant to this appeal occurred on 32 acres of the Oneida Nation located within the city limits of Oneida, New York--hereinafter referred to as "The Territory". In fall 1987 and winter 1988, the defendants were involved on one side of a bitter, intratribal struggle over several issues, including the management of a bingo hall located on The Territory.
 
 
 2
 Defendants argue that the federal government lacked jurisdiction to prosecute them. They claim that because the conduct for which they were indicted occurred on The Territory, it is only the Oneida Nation, and not the federal government, that may exercise sovereignty over their offenses. They also challenge certain aspects of the jury charge and the sufficiency of the evidence. For the reasons discussed below, we conclude that the district court properly exercised jurisdiction over all crimes charged in the indictment. However, we reverse the convictions on counts I and II because of errors in the jury charge, and remand those counts to the district court for further proceedings. We reverse Linda Marks's perjury conviction on count XII and dismiss that count. We affirm the other convictions.
 
 I. FACTS
 
 3
 As the Supreme Court has noted, Indian tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory." United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975) (citing Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832)). "Although physically within the territory of the United States and subject to ultimate federal control, they nonetheless remain 'a separate people, with the power of regulating their internal and social relations.' " United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 1085, 55 L.Ed.2d 303 (1978) (quoting United States v. Kagama, 118 U.S. 375, 381-82, 6 S.Ct. 1109, 1112-13, 30 L.Ed. 228 (1886)). In the administration of their internal relations Indians, therefore, enjoy "broad freedom not enjoyed by any other governmental authority in this country." Duro v. Reina, 495 U.S. 676, 694, 110 S.Ct. 2053, 2064, 109 L.Ed.2d 693 (1990) (citing Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56 & n. 7, 98 S.Ct. 1670, 1675 & n. 7, 56 L.Ed.2d 106 (1978)).
 
 
 4
 A. The Oneida Nation and the New York Territory.
 
 
 5
 At trial, Carol Bacon, director of tribal relations for the Bureau of Indian Affairs ("BIA"), testified that the New York Oneidas have selected a traditional form of tribal government to administer their internal relations. She added that in July 1987 the BIA recognized the Oneidas' government for two purposes: (1) to conduct relations with the New York Oneidas so that the federal government could provide federal funds and other governmental services to The Territory, and (2) to provide groups of Oneidas a conduit through which they could communicate with the federal government.
 
 
 6
 Ultimately subject to the Nation's nine-member council of chiefs, which rules the Oneida territories in both Canada and the United States, the New York Oneidas' traditional form of government consists of several decisionmaking bodies designed to reach accord through consensus. The Oneidas convene Nation meetings that discuss matters of importance to the Oneida Nation as a whole. Men and women of The Territory also meet in separate councils to address other issues. Local residents on occasion also convene a territorial council to discuss specific problems that arise on The Territory. For some time until the events relevant to this appeal, however, the territorial council in New York State had lain dormant, only to be revived in January 1988 by some Oneidas who claimed that it was the only source of power on The Territory.
 
 
 7
 B. The Bingo Hall.
 
 
 8
 A major center of activity on The Territory was the Nation's bingo hall, which the Oneidas had opened in 1985. Several Oneidas had contributed initially to the project, including the defendant Donald Marks, who had invested $10,000. Initially, a general manager administered the bingo hall's daily operations and was also responsible for managing The Territory's other businesses. Raymond Halbritter, whom the BIA recognized in January 1988 as The Territory's representative to the federal government, was the first general manager. In February 1987 he was replaced by John Dyer, another Oneida, who, in turn, stepped down as general manager in late October 1987.
 
 
 9
 C. The Business Committee and Growing Frictions.
 
 
 10
 Dyer's responsibilities were then assumed by a three-person "business committee" made up of one member from each of the three clans--wolf, turtle, and bear--that make up the Oneida Nation.
 
 
 11
 The business committee's legitimacy and the scope of its authority soon became a source of controversy. Some Oneidas clashed with the committee over its administration of the bingo hall. Defendant William Beglen, for example, who managed the bingo hall's computer system, resigned in November 1987 after having several differences with the business committee.
 
 
 12
 Other Oneidas questioned whether the business committee had too much power over other aspects of tribal life. The committee, for example, paid out of bingo hall revenues the salaries of some tribal employees who did not work in the bingo hall.
 
 
 13
 Defendant Otatdodah Homer coordinated The Territory's cultural and recreational activities with her two sisters, Linda Thomas and Irene Hill; their salaries were paid by the business committee from bingo hall funds. Homer challenged the business committee's practice of keeping its records in an office outside The Territory, in Canastota, New York. After Homer confronted a business committee member demanding that the records be kept on sovereign Indian territory, the business committee suspended her as a cultural coordinator and withheld her salary.
 
 
 14
 These incidents increased dissension on The Territory. Several Oneidas, including Beglen, attended informal meetings to discuss the legitimacy of the business committee and the administration of the bingo hall. On December 6, a few Oneidas prevented a bingo hall employee from taking the bank deposit to a bank outside The Territory. The bingo hall then ceased operations on December 9, 1987, and turmoil on The Territory increased. At the request of defendant Donald Marks, several Oneidas from the Nation's Canadian territory appeared on The Territory in mid-December.
 
 
 15
 D. The Federal Court Civil Suit.
 
 
 16
 In January 1988 internal tribal relations continued to deteriorate. Seeking to prevent further disruption of the tribal businesses, Raymond Halbritter, the bingo hall's first general manager, filed a civil complaint on behalf of the Oneida Nation in the United States District Court for the Northern District of New York, Thomas J. McAvoy, Judge. See Oneida Indian Nation of New York v. Hill, 1988 WL 9302 (N.D.N.Y.1988). The complaint included as defendants Donald Marks and Linda Marks, as well as several of the Canadian Oneidas, who had also opposed the authority of the business committee. Judge McAvoy granted a temporary restraining order on January 11, 1988, and entered a preliminary injunction on February 2, 1988.
 
 
 17
 E. Division of the Bingo Hall Money.
 
 
 18
 Linda Marks purported to revive the tribe's dormant territorial council, of which she had been a member. Claiming that she and other territorial council members had the authority to dispense the bingo hall money, Marks and several Oneidas on January 12, 1988, the day after Judge McAvoy entered the temporary restraining order, gathered in the bingo hall to divide more than $60,000 in bingo hall revenues. Some of the charges at trial arose out of the fact that several Oneidas, including three of the defendants, received portions of the $60,000 that was divided at that meeting. Defendant Otatdodah Homer received $1,050 for her work on the recreation committee. Defendant Donald Marks received $28,000, which he claimed was payment for his initial investment in the bingo hall and also "back pay" for when he worked as a security officer for the bingo hall. Defendant William Beglen received $1,065 in "back pay" for his work as a computer systems manager. Although Linda Marks apparently did not receive money for herself, she was indicted along with the other three for conspiring to receive and receiving stolen Indian tribal funds. See 18 U.S.C. § 1163.
 
 
 19
 F. Confrontations and Violence.
 
 
 20
 Testimony at trial revealed several incidents and confrontations between feuding Oneida factions during January 1988; William Beglen, Brenda Kane, John Kane, Donald Marks, and Linda Marks were among those who were involved in these incidents. In one such incident, several of these defendants were part of a group of more than 30 people who, on January 4, 1988, visited the home of business-committee-member Charles Fougnier, and requested Fougnier to hand over the Nation's checkbooks. In other incidents, groups including some of the defendants closed and damaged a gas station operated by Raymond Halbritter's family on January 5, 1988; broke into the bingo hall on January 9, 1988, and assaulted two Oneidas; and confronted television reporters who were visiting The Territory on January 28, 1988. These and other events formed the basis for counts III and IV of the indictment, which charged that the defendants conspired to violate, and violated, the federal anti-riot act. See 18 U.S.C. § 2101.
 
 
 21
 One serious incident during this period, which formed the basis for count VII, was the burning of the bingo hall in the early morning hours of February 21, 1988. Four of the defendants--Donald Marks; his wife, Linda Marks; the Marks's son-in-law, John Kane; and William Beglen--were indicted for maliciously damaging a building used in an activity affecting interstate or foreign commerce by means of a fire or explosion. See 18 U.S.C. § 844(i).
 
 
 22
 We now turn to the specifics of the indictment.
 
 II. INDICTMENT
 
 23
 On June 15, 1989, the grand jury returned a 15-count superseding indictment that named 13 separate defendants. Only seven of them were tried: William Beglen, Otatdodah Homer, Brenda Kane, John Kane, Donald Marks, Linda Marks, and Neil Thomas. Six of these defendants are before us; the appeal of the seventh defendant, Neil Thomas, was previously dismissed for lack of prosecution but was subsequently reinstated and will be heard by another panel of this court. Four other defendants, Larry Chrisjon, Edward Dockstater, Jason Dockstater, and Martin Dockstater--all members of the Canadian Oneida tribe--fled the jurisdiction. Two other defendants, Linda Hill and Irene Thomas, pled guilty and cooperated with the government by testifying at trial.
 
 
 24
 At pretrial the district court dismissed two of the indictment's 15 counts. The remaining counts charged three conspiracies and ten substantive crimes. For convenience, we break down these counts into four groupings: (1) theft of tribal funds; (2) riot; (3) destruction of the bingo hall; and (4) offenses committed while the civil proceedings were pending. In discussing each count, we address only those defendants whose appeals are before us today.
 
 
 25
 A. Theft of Tribal Funds.
 
 
 26
 Count I charged William Beglen, Otatdodah Homer, Donald Marks, and Linda Marks with conspiracy to receive monies from an Indian tribal organization, see 18 U.S.C. §§ 371, 1163; count II charged the same defendants with the underlying substantive offense of stealing from a tribal organization.
 
 
 27
 B. Incitement to Riot.
 
 
 28
 Count III charged Beglen, Brenda Kane, John Kane, Donald Marks, and Linda Marks with conspiracy to travel in interstate commerce or to use a facility of interstate commerce with the intent to incite a riot. See 18 U.S.C. §§ 371, 2101. Count IV charged the same defendants with the underlying substantive offense.C. Destruction of the Bingo Hall.
 
 
 29
 Count VII charged Beglen, John Kane, Donald Marks, and Linda Marks with conspiracy to maliciously damage a building used in interstate commerce through the use of fire or an explosion. See 18 U.S.C. § 844(i).
 
 
 30
 D. Offenses Arising from the Civil Suit.
 
 
 31
 1. Retaliation Against a Witness.
 
 
 32
 Count VIII charged John Kane and Donald Marks with assaulting Ray Halbritter's brother, Barry, in retaliation for the Halbritters' participation in the Nation's civil suit against the Markses and others. See 18 U.S.C. §§ 2, 1513.
 
 
 33
 2. Contempt.
 
 
 34
 Count IX charged Donald Marks with criminal contempt for disobeying Judge McAvoy's preliminary injunction by assaulting Barry Halbritter. See 18 U.S.C. § 402.
 
 
 35
 3. Perjury.
 
 
 36
 The final six counts, X, XI, XII, XIII, XIV, and XV, charged Beglen, John Kane, Donald Marks, and Linda Marks with perjuring themselves during depositions taken in connection with the civil suit. See 18 U.S.C. § 1621(1).
 
 III. TRIAL AND SENTENCING
 
 37
 The trial began on March 5, 1990. The government put on 57 witnesses; its evidence focused mainly on events that occurred on The Territory between November 1987 and February 1988. The government also presented evidence of later offenses that were connected with the Nation's civil suit.
 
 
 38
 After deliberating six days, the jury returned its verdicts:
 
 
 39
 On counts I and II, conspiracy to steal tribal funds and stealing tribal funds, the jury convicted Beglen, Homer, Donald Marks, and Linda Marks.
 
 
 40
 On count III, conspiracy to violate the anti-riot act, the jury convicted Beglen, Brenda Kane, John Kane, Donald Marks, and Linda Marks.
 
 
 41
 On count IV, violating the anti-riot act, the jury convicted Beglen, Brenda Kane, John Kane, and Donald Marks; the jury acquitted Linda Marks on this count.
 
 
 42
 On count VII, conspiracy to violate 18 U.S.C. § 844(i), maliciously damaging or destroying a building affecting interstate commerce by means of fire or explosives, the jury convicted Beglen, John Kane, Donald Marks, and Linda Marks.
 
 
 43
 On count VIII, witness tampering, the jury convicted John Kane and Donald Marks.
 
 
 44
 On count IX, criminal contempt, the jury convicted Donald Marks.
 
 
 45
 On counts X through XV, perjury, the jury convicted William Beglen on one count, Donald Marks on two counts, and Linda Marks on one count; the jury acquitted John Kane and Linda Marks each on one perjury count.
 
 
 46
 Judge Munson sentenced the six appellants on January 25, 1991. The district court applied the sentencing guidelines to all convictions, with exception of the counts III and IV, as the anti-riot act offense is not addressed by the guidelines. The sentences were as follows:
 
 
 47
 Defendant Imprisonment Supervised Release Restitution
W. Beglen 27 months 2 years $1,065
O. Homer 2 years' probation (100 hours' community $1,050
 service)
B. Kane 1 year probation (100 hours' community None
 service)
J. Kane 24 months 2 years None
D. Marks 30 months 3 years $28,000
L. Marks 21 months 2 years None
 
 
 48
 All defendants were fined the mandatory special assessments.
 
 
 49
 On appeal defendants make various challenges to their convictions. Three defendants--Brenda Kane, John Kane, and Donald Marks--claim that the district court lacked jurisdiction over them because their offenses are part of an internal tribal dispute that congress has exempted from federal criminal law. Those convicted for stealing money from the tribal organization argue that the district court incorrectly instructed the jury as to the elements of the crime. The perjury convictions present still other problems. All defendants argue that the evidence was insufficient to sustain some or all of their convictions. We address each of these claims in turn.
 
 IV. JURISDICTIONAL ISSUES
 
 50
 At pretrial the defendants challenged the exercise of federal criminal jurisdiction over the charged offenses. See United States v. Markiewicz, 1989 WL 139221 (N.D.N.Y.1989). They claimed that, with the exception of crimes specifically enumerated by congress, Indian tribes retain exclusive jurisdiction over Indian-against-Indian offenses committed on Indian territory. The district court rejected these claims and concluded that "federal criminal laws of general applicability apply even where a native American is both the defendant and the victim and the acts complained of occurred on a reservation". Id. at (citations omitted). We agree that the district court properly exercised jurisdiction over these offenses; however, for the reasons discussed below, our reasoning differs from that of the district court. To explain our disagreement with the district court, we must first explore the admittedly tangled statutory framework that governs the application of federal criminal laws to offenses committed on Indian territory.
 
 
 51
 A. Enclave Laws Generally.
 
 
 52
 We first turn to a discussion of the federal enclave laws, which congress has applied to Indian territories in a limited manner. The federal enclave laws are a group of statutes that permits the federal courts to serve as a forum for the prosecution of certain crimes when they occur within the "[s]pecial maritime and territorial jurisdiction of the United States", 18 U.S.C. § 7; this jurisdiction includes federal land, and property such as federal courthouses and military bases.
 
 
 53
 The federal enclave laws define crimes such as: arson, see 18 U.S.C. § 81; assault, see 18 U.S.C. § 113; maiming, see 18 U.S.C. § 114; theft, see 18 U.S.C. § 661; receiving stolen property, see 18 U.S.C. § 662; using false pretenses, see 18 U.S.C. § 1025; murder, see 18 U.S.C. § 1111(b); manslaughter, see 18 U.S.C. § 1112; attempted murder, see 18 U.S.C. § 1113; conspiracy to murder, see 18 U.S.C. § 1117; kidnapping, see 18 U.S.C. § 1201(a)(2); destruction of buildings or property, see 18 U.S.C. § 1363; robbery, see 18 U.S.C. § 2111; offenses against United States seamen, see 18 U.S.C. §§ 2191-93; and crimes involving sexual abuse, see 18 U.S.C. §§ 2241-44. Additionally, the assimilative crimes act, see 18 U.S.C. § 13, permits a federal court to borrow a state's criminal laws where there is no federal law proscribing an offense committed on an enclave within that state; the act permits the federal court to serve as a forum for the prosecution.
 
 
 54
 B. Enclave Laws on Indian Territory--18 U.S.C. § 1152.
 
 
 55
 Crimes that occur on the Indian territories, however, present a jurisdictional problem because, unlike territorial waters and property owned directly by the federal government, we have always recognized that the Indian nations exercise some jurisdiction over their members and their territories. See 18 U.S.C. § 1152; Duro, 495 U.S. at 694, 110 S.Ct. at 2064. At the same time, federal interests also extend into Indian territory.
 
 
 56
 To accommodate the competing Indian and federal interests in punishing offenses by Indians on Indian territory, congress has enacted two statutes, 18 U.S.C. §§ 1152 and 1153. Section 1152 applies the federal enclave laws to Indian territory, see Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 208, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978), but in a limited fashion. It specifies that the federal enclave laws "shall extend to the Indian country." It further states, however, that the enclave laws
 
 
 57
 shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.
 
 
 58
 18 U.S.C. § 1152 (emphasis added).
 
 
 59
 Based on this statute, the Supreme Court determined in Ex parte Crow Dog, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), that the federal government could not prosecute an Indian who, on Indian territory, had murdered another member of his tribe. The Crow Dog prosecution was brought under the predecessor of § 1152 against an Indian defendant who had murdered another member of his tribe on Indian territory. The Supreme Court determined that because such crimes were excluded by the statute from federal jurisdiction and because congressional policy allowed the Indians to "regulat[e] by themselves * * * their own domestic affairs [and] the maintenance of order and peace among their own members by the administration of their own laws and customs", id. at 568, 3 S.Ct. at 403, the prosecution of such a crime must be left to the Indian tribal processes.
 
 
 60
 C. The Indian Major Crimes Act--18 U.S.C. § 1153.
 
 
 61
 Congress reacted to Crow Dog, by enacting in 1885 the Indian Major Crimes Act--currently § 1153--which conferred federal court jurisdiction over a limited number of Indian-against-Indian "major" offenses committed on Indian territory. Originally the statute specified seven offenses; it has since been expanded to 13. It currently provides:
 
 
 62
 Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A [sexual abuse], incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.
 
 
 63
 18 U.S.C. § 1153(a) (emphasis added).
 
 
 64
 In United States v. Quiver, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916), the relevant offense was adultery, one not enumerated in the major crimes act. Noting that the act's "enumeration * * * of certain offenses as applicable to Indians in the reservations carries with it some implication of a purpose to exclude others", id. at 606, 36 S.Ct. at 700, the Court concluded that jurisdiction over Quiver's adultery did not lie in the federal courts.
 
 
 65
 The combined effect of the two statutes as interpreted by Crow Dog and Quiver, then, is that "the relations of the Indians, among themselves--the conduct of one toward another--is to be controlled by the customs and laws of the tribe, save when Congress expressly or clearly directs otherwise". Quiver, 241 U.S. at 605-06, 36 S.Ct. at 700.
 
 
 66
 D. Application to this Case.
 
 
 67
 In approaching the jurisdictional problems in this case, the district court disregarded Quiver and determined that all federal statutes of general applicability, which apply to "acts which are criminal regardless of their location in the United States", Markiewicz, 1989 WL 139221 at *5, apply of their own force to the Indian territories.
 
 
 68
 In essence, the district court concluded that, notwithstanding Quiver, any criminal law passed by congress applies of its own force to the Indian territories. The eighth circuit has taken this approach, see United States v. Blue, 722 F.2d 383, 385-86 (8th Cir.1983) (district court properly exercised jurisdiction over Indian for violation of federal narcotics statutes on Indian territory); Stone v. United States, 506 F.2d 561, 563 (8th Cir.1974) (where Indian defendant assaulted Indian federal officer on Indian territory, district court may exercise jurisdiction under "laws of the United States that make actions criminal wherever committed"), cert. denied, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975); United States v. McGrady, 508 F.2d 13, 16 (8th Cir.1974) (jurisdiction exists where a criminal statute "makes certain actions criminal regardless of where they are committed"), cert. denied, 420 U.S. 979, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975). The ninth circuit, too, has determined that federal criminal laws apply of their own force to Indian territories. See United States v. Young, 936 F.2d 1050, 1055 (9th Cir.1991) (where Indian defendant assaulted federal officer, shipped firearms, and carried a firearm during the commission of another offense, jurisdiction existed over such violation of statutes of "general, non-territorial applicability"); United States v. Burns, 529 F.2d 114, 116-117 (9th Cir.1975) (district court properly had jurisdiction over Indian defendant's violation of firearm-possession statute); Walks on Top v. United States, 372 F.2d 422, 425 (9th Cir.) (where Indian defendant assaulted Indian BIA officer on Indian territory, district court may properly exercise jurisdiction over violation of "general law" of the United States), cert. denied, 389 U.S. 879, 88 S.Ct. 109, 19 L.Ed.2d 170 (1967). But see United States v. Jackson, 600 F.2d 1283, 1286 (9th Cir.1979) (court states general rule that, "except for the offenses enumerated in [section 1153], all crimes committed by enrolled Indians against other Indians within Indian country are subject to the jurisdiction of tribal courts"). Additionally, one other district court in this circuit has concluded that the federal criminal statutes "apply of their own accord" to the Indian territories. United States v. Burns, 725 F.Supp. 116, 121 (N.D.N.Y.1989), aff'd sub nom. on other grounds, United States v. Cook, 922 F.2d 1026 (2d Cir.1991).
 
 
 69
 Despite these holdings, there is an alternative approach that is more deferential to the Supreme Court's determination in Quiver that congress's inclusion of certain crimes in the major crimes act "carries with it some implication of a purpose to exclude other[ ]" crimes. Quiver, 241 U.S. at 606, 36 S.Ct. at 700. The fourth circuit in United States v. Welch, 822 F.2d 460 (4th Cir.1987), followed this alternative rationale when it reversed the conviction of an Indian who had been prosecuted under the assimilative crimes act, 18 U.S.C. § 13, for raping another Indian on Indian territory, the court in Welch said that the government could not invoke the assimilative crimes act in order to apply North Carolina criminal law, noting that "[w]hen there is a crime by an Indian against another Indian within Indian country only those offenses enumerated in the Major Crimes Act may be tried in the federal courts." Id. at 464 (citing United States v. Antelope, 430 U.S. 641, 643, 97 S.Ct. 1395, 1397, 51 L.Ed.2d 701 (1977)).
 
 
 70
 In 1976 congress apparently adopted this approach when it addressed Indian-against-Indian crimes on Indian territory in the legislative history of the Indian Crimes Act:
 
 
 71
 Indian against Indian crimes occurring in Indian country.--Section 1153 provides for Federal jurisdiction over the 13 enumerated offenses. Jurisdiction over other offenses rests with the tribe. See T. Vollman, "Criminal Jurisdiction in Indian Country: Tribal Sovereignty and Defendants' Rights in Conflict," 22 Kansas L.Rev. 387, 390 (1974).
 
 
 72
 Exceptions.--The above pattern is subject to two overriding exceptions. First, some Federal laws have ceded to certain States complete or concurrent criminal jurisdiction over certain Indian country.
 
 
 73
 The second overriding exception is for crimes that are peculiarly Federal. Thus, there is federal jurisdiction when the offense is one such as assaulting a federal officer (18 U.S.C. [s]s 111 and 1114) or defrauding the United States.
 
 
 74
 H.R.Rep. No. 94-1038, 94th Cong., 2d Sess. 3 (1976), reprinted in 1976 U.S.C.C.A.N. 1125, 1127.
 
 
 75
 Further, the seventh circuit has determined that a federal district court had jurisdiction over an Indian defendant who assaulted an Indian BIA officer on Indian territory, because the assault on a federal officer was a "peculiarly Federal" offense. United States v. Smith, 562 F.2d 453, 458 (7th Cir.1977), cert. denied, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978).
 
 
 76
 The Supreme Court implicitly adopted this reasoning in United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). In Wheeler, a footnote stated that federal jurisdiction extends "to crimes over which there is federal jurisdiction regardless of whether an Indian is involved, such as assaulting a federal officer". Id. at 330 n. 30, 98 S.Ct. at 1089 n. 30. In a subsequent footnote, the Court explained that there is federal jurisdiction over such crimes because "federal criminal jurisdiction over Indians extends * * * to offenses as to which there is an independent federal interest to be protected". Id. at 331 n. 32, 98 S.Ct. at 1090 n. 32. Thus, the second approach to federal jurisdiction over Indian-against-Indian offenses on Indian territory seemingly recognizes Quiver 's conclusion that federal jurisdiction does not exist over Indian-against-Indian crimes that congress fails to enumerate, except where such offenses constitute "peculiarly Federal" crimes, and the prosecution of such offenses would protect an independent federal interest.
 
 
 77
 The district court here determined that, contrary to Quiver, all federal criminal laws applied to Indians who commit crimes against other Indians on Indian territory. We need not pass, however, on the validity of the district court's approach, because viewing these offenses separately, we conclude that jurisdiction exists over the defendants for reasons different from those articulated by the district court. First, some of the offenses were not crimes "against the person or property of another Indian or other person", and therefore did not trigger the Quiver rule. Second, some offenses did not occur "within the Indian country", and those defendants therefore cannot rely on Quiver. Finally, even where the offense constituted an Indian-against-Indian crime on Indian territory, congress has explicitly granted jurisdiction over those crimes to the federal courts. We now turn to those separate offenses.
 
 
 78
 1. 18 U.S.C. § 1163--Theft of Tribal Funds.
 
 
 79
 Four of the appellants were charged with both conspiring to receive and receiving money misapplied or stolen from an Indian tribal organization in violation of 18 U.S.C. § 1163. Jurisdiction here is appropriate, as § 1163 clearly grants federal jurisdiction over Indian defendants who commit this crime against Indian victims on Indian territory.
 
 
 80
 The statute itself refers to: "Whoever embezzles, steals, knowingly converts to his use * * * any of the moneys * * * belonging to any Indian tribal organization or intrusted to the custody or care of any officer, employee or agent of an Indian tribal organization * * * ". 18 U.S.C. § 1163 (emphasis added). With this reference to the embezzlement and conversion of monies entrusted to the "officer" of an "Indian tribal organization", congress signalled its intent to confer federal-court jurisdiction over Indians committing this offense, because those most likely to commit the offense would be Indians.
 
 
 81
 Even if the statutory language were not clear, the legislative history confirms that by this 1956 statute, congress sought to create federal-court jurisdiction over this particular kind of Indian-against-Indian crime. The Assistant Secretary of the Interior wrote to the President of the Senate that
 
 
 82
 [t]he principal objective of the proposed bill is to protect Indian tribal organizations * * * from the actions of dishonest or corrupt tribal officials. It provides for the punishment of persons holding positions of trust in tribal organizations who abuse their responsibilities by diverting tribal funds to their own pockets or those of their friends.
 
 
 83
 S.Rep. No. 2723, 84th Cong., 2d Sess. (1956), reprinted in 1956 U.S.C.C.A.N. 3841, 3841-42 (letter of Fred G. Aandahl, Assistant Secretary of the Interior) (emphasis added). Thus, through the enactment of § 1163, congress added yet another exception to the general bar to federal jurisdiction over Indian-against-Indian crimes.
 
 
 84
 2. 18 U.S.C. § 844(i)--Maliciously Damaging a Building in Interstate Commerce by Means of Fire or Explosive.
 
 
 85
 Several defendants were convicted under 18 U.S.C. § 844(i), a general federal criminal statute, for conspiring to destroy the bingo hall, which was located on the Oneida territory and run by the Oneida Nation. Section 844(i) provides in relevant part that
 
 
 86
 [w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce [shall be guilty of a crime].
 
 
 87
 18 U.S.C. § 844(i) (emphasis added).
 
 
 88
 As we discussed above, arson is enumerated in the major crimes act as a crime over which the federal courts have jurisdiction. See 18 U.S.C. § 1153. There are two federal arson statutes which could then apply to the Indian territory: (1) 18 U.S.C. § 81, which punishes arson committed on federal enclaves, and (2) 18 U.S.C. § 844(i), the statute under which defendants were prosecuted.
 
 
 89
 The defendants contend that § 844(i) is anti-bombing, not anti-arson, legislation, and there is some support in United States v. Gelb, 700 F.2d 875, 878 (2d Cir.), cert. denied, 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983), for the proposition that § 844(i) as originally enacted was not intended to be anti-arson legislation. As we recognized in Gelb, however, congress explicitly amended the statute in 1982 to confer federal jurisdiction over arson crimes. See Anti-Arson Act of 1982, Pub.L. No. 97-298, 96 Stat. 1319 (1982); see also Gelb, 700 F.2d at 879 (anti-arson act reflects congress's unequivocal view "that federal authorities will henceforth share responsibility with state officials to investigate and prosecute arson crimes").
 
 
 90
 Because arson is enumerated in § 1153, and because § 844(i) now punishes arson, the district court properly exercised jurisdiction over this offense.
 
 
 91
 3. 18 U.S.C. § 1513--Witness Tampering.
 
 
 92
 John Kane and Donald Marks were convicted for retaliating against a witness. See 18 U.S.C. § 1513. The charge stemmed from these defendants' August 14, 1988, assault on Barry Halbritter, who had participated in his brother Ray's civil suit that sought to enjoin Marks and others from interfering in the conduct of the tribal businesses. Kane and Marks would have us treat this assault, just as the other crimes, as being within the Oneida Nation's "exclusive jurisdiction over criminal acts between Indians on their territory".
 
 
 93
 This offense, however, occurred outside a Syracuse, New York restaurant, and not "within the Indian country". 18 U.S.C. § 1153. On that basis alone, defendants' jurisdictional claim fails. See, e.g., Cardinal v. United States, 954 F.2d 359 (6th Cir.1992) (jurisdictional issues arise only where crime occurs on Indian territory); United States v. Smith, 562 F.2d 453, 457 (7th Cir.1977) (same).
 
 
 94
 4. 18 U.S.C. § 402--Contempt.
 
 
 95
 The government charged Donald Marks with criminal contempt because his assault on Barry Halbritter--the same conduct sought to be punished by the witness-tampering charge--had violated Judge McAvoy's February 2, 1988, preliminary injunction. Since that conduct did not occur on Indian territory, this jurisdictional challenge fails for the same reason as their witness tampering challenge fails.
 
 
 96
 5. 18 U.S.C. § 1621(1)--Perjury.
 
 
 97
 Four of the appellants were indicted for perjuries arising out of testimony they gave in relation to the Nation's civil case. The victims, however, were not Indians, but the federal court system itself. The federal perjury statute, 18 U.S.C. § 1621, governs the relationship between citizens and the federal judicial process; its purpose is to punish an offender for the "wrong done to the courts and the administration of justice". United States v. Manfredonia, 414 F.2d 760, 764 (2d Cir.1969). Measured by this purpose, the district court's exercise of jurisdiction was proper.
 
 
 98
 6. 18 U.S.C. § 2101--Anti-riot Act.
 
 
 99
 Finally, we must consider whether the district court had jurisdiction over the charges brought under the federal anti-riot act, which were based on, among other events, the shuttering of the gas station on January 5 and the bingo hall break-in on January 9. The anti-riot act provides in relevant part that
 
 
 100
 a)(1) Whoever travels in interstate or foreign commerce or uses any facility of interstate commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent --
 
 
 101
 (A) to incite a riot; or
 
 
 102
 (B) to organize, promote, encourage, participate in, or carry on a riot; or
 
 
 103
 (C) to commit any act of violence in furtherance of a riot; or
 
 
 104
 (D) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act in furtherance of a riot;
 
 
 105
 and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph [shall be guilty of a crime].
 
 
 106
 18 U.S.C. § 2101 (emphasis added).
 
 
 107
 At trial, the evidence showed that Donald Marks had made and completed a phone call to Canada on December 6, 1987, during which he solicited the assistance of Canadian Oneidas in the territorial conflict. Thus, this part of the crime by definition occurred, at least in part, off the Indian territory. Consequently, the anti-riot act offenses did not occur solely "within the Indian country", 18 U.S.C. § 1153, and the district court properly exercised jurisdiction over the defendants.
 
 
 108
 E. Other Jurisdictional Claims.
 
 
 109
 Defendants advance two other jurisdictional arguments, both of which fail.
 
 
 110
 1. Treaty of Canandaigua.
 
 
 111
 The first claim is that the federal government is prevented from exercising criminal jurisdiction over the charged offenses because such a prosecution would violate Article II of the 1794 Treaty of Canandaigua between the United States and six Indian Nations--including the Oneidas. Specifically, the defendants argue that the treaty, which guarantees the Oneidas "the free use and enjoyment" of their tribal lands, see 7 Stat. 45, precludes the imposition of federal jurisdiction over these incidents, which defendants characterize as part of an intratribal dispute.
 
 
 112
 Defendants rely on the well-recognized principle that " 'the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress.' " Menominee Tribe of Indians v. United States, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968) (quoting Pigeon River Co. v. Cox Co., 291 U.S. 138, 160, 54 S.Ct. 361, 367, 78 L.Ed. 695 (1934)). The Supreme Court, however, has previously rejected the argument that "Congress could not pass a jurisdictional law of general applicability to Indian country unless in so doing it itemized all potentially conflicting treaty rights that it wished to affect." Washington v. Yakima Indian Nation, 439 U.S. 463, 478 n. 22, 99 S.Ct. 740, 750 n. 22, 58 L.Ed.2d 740 (1979).
 
 
 113
 2. 25 U.S.C. § 232.
 
 
 114
 Appellant John Kane contends that congress has ceded to the State of New York exclusive jurisdiction over offenses "committed by or against Indians on Indian reservations". 25 U.S.C. § 232. This claim fails because we have recently concluded that § 232 extends to the State of New York only "concurrent jurisdiction" over these crimes, and does not preclude the exercise of federal jurisdiction. See United States v. Cook, 922 F.2d 1026, 1032-33 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).
 
 
 115
 We now turn to defendants' other challenges to their convictions.
 
 V. STOLEN TRIBAL FUNDS
 
 116
 Defendants Beglen, Homer, Donald Marks, and Linda Marks all challenge aspects of the district court's charge on counts I and II, conspiring to receive and receiving stolen tribal funds in violation of 18 U.S.C. § 1163.
 
 
 117
 Since the defendants failed to raise these objections to the court's charge at trial, we may review only for plain error. See Fed.R.Crim.P. 52(b); United States v. Campuzano, 905 F.2d 677, 678-79 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990); United States v. Walsh, 700 F.2d 846, 856 n. 6 (2d Cir.), cert. denied, 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983).
 
 
 118
 In setting forth to the jury the elements of a § 1163 violation, the district court charged the following:
 
 
 119
 In order to prove that each Defendant is guilty of theft or conversion or misapplication of Indian tribal organization funds, the Government must prove each of the following elements beyond a reasonable doubt:
 
 
 120
 1. That the defendant that you are considering knowingly received, concealed or retained monies;
 
 
 121
 2. That the defendant you are considering had the intent to convert said monies to their own use or to the use of another; and
 
 
 122
 3. That said monies were embezzled, stolen, converted or misapplied from an Indian tribal organization.
 
 
 123
 While the government contends that each Defendant you are considering knew that the funds belonged to an Indian tribal organization, it is not an element of the crime which must be proved beyond a reasonable doubt.
 
 
 124
 (emphasis added).
 
 
 125
 In providing instructions as to the definition of an Indian tribal organization, the district court essentially repeated the statutory definition, which defines an Indian tribal organization as
 
 
 126
 any tribe, band, or community of Indians which is subject to the laws of the United States relating to Indian affairs or any corporation, association, or group which is organized under any such laws.
 
 
 127
 18 U.S.C. § 1163.
 
 
 128
 The defendants claim three errors in this charge: (1) failure to charge that the defendants must have knowledge that the bingo hall funds were stolen; (2) failure to properly define an Indian tribal organization; and (3) failure to charge that the defendants must have knowledge that the stolen funds belonged to an Indian tribal organization.
 
 
 129
 We agree with the defendants that number 3 constituted plain error, and address numbers 1 and 2 only to the extent that such discussion will provide guidance to the district court in providing proper jury instructions for retrial, if the government elects to reprosecute the defendants.
 
 
 130
 First, defendants argue that the district court failed to instruct the jury that the government was required to prove that the defendants knew that the funds that they received were stolen. The government concedes in its post-argument letter brief that the district court "failed specifically to instruct the jury that it had to find that the defendants knew the money was stolen", but it correctly points out that other aspects of the jury instruction--including the district court's reading of the statute--served to cure this notable omission. Although we believe a more explicit instruction would have been preferable to this less-than-clear charge, we agree with the government that the omission did not constitute plain error. When read as a whole, the instruction--including the portion advising the jury that it was required to find that the defendants "had the intent to convert [the bingo hall funds] to their own use or to the use of another"--was sufficient to instruct on the issue of knowledge with regard to the stolen nature of the funds. See Francis v. Franklin, 471 U.S. 307, 315, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985) (where defendants claim that portion of jury charge relieved prosecution of the burden of persuasion, such portion "must be considered in the context of the charge as a whole").
 
 
 131
 As to defendants' argument that the district court improperly defined an Indian tribal organization, we find no error. First, defendants provide no alternative definition of an Indian tribal organization. Second, the district court's repetition of the statutory definition in the circumstances of this case provided sufficient guidance.
 
 
 132
 We now turn to defendants' remaining challenges to their convictions on counts I and II.
 
 
 133
 A. Failure to Include an Essential Element of the Offense.
 
 
 134
 Both Beglen and Homer argue on appeal that the district court committed plain error when it told the jury that knowledge as to the source of the stolen funds was not an element of the § 1163 offense. We agree.
 
 
 135
 The omission of an offense's essential element from the district court's jury charge can amount to plain error that is reviewable despite a defendant's failure to object at trial. See United States v. Javino, 960 F.2d 1137, 1141 (2d Cir.1992) (citing United States v. Mazzei, 700 F.2d 85, 87-88 (2d Cir.), cert. denied, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); United States v. De Marco, 488 F.2d 828, 832 (2d Cir.1973)), petition for cert. filed, (U.S. Sept. 21, 1992) (No. 92-6074).
 
 
 136
 If the district court omitted an element but the evidence was sufficient to prove that element beyond a reasonable doubt, "the appropriate remedy is vacation of the conviction and remand for a new trial." Javino, 960 F.2d at 1141 (citing United States v. Londono-Villa, 930 F.2d 994, 1001 (2d Cir.1991)). If, however, the evidence presented in the district court was insufficient to prove the missing element, "we must reverse and order dismissal of that count." Id. (citing Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).
 
 
 137
 We conclude that the district court's instructions for counts I and II omitted an essential element of the offense--knowledge of the source of the stolen funds--and we therefore reverse defendants' convictions on those counts. Because the evidence presented at trial was sufficient to prove that missing element, however, we remand to the district court for a new trial on those counts.
 
 
 138
 The defendants were charged with a violation of 18 U.S.C. § 1163, which provides in relevant part:
 
 
 139
 Whoever embezzles, steals, knowingly converts to his use or the use of another, willfully misapplies, or willfully permits to be misapplied, any of the moneys, funds, credits, goods, assets, or other property belonging to any Indian tribal organization or intrusted to the custody or care of any officer, employee, or agent of an Indian tribal organization; or
 
 
 140
 Whoever, knowing any such moneys, funds, credits, goods, assets, or other property to have been so embezzled, stolen, converted, misapplied or permitted to be misapplied, receives, conceals, or retains the same with intent to convert it to his use or the use of another [is guilty of a violation of this section].
 
 
 141
 18 U.S.C. § 1163 (emphasis added).
 
 
 142
 The indictment here charged the defendants with a violation of the second paragraph, namely, the receipt of stolen tribal funds. The second paragraph of § 1163 refers to "[w]hoever, knowing any such [property] to have been so embezzled, stolen, converted, misapplied or permitted to be misapplied, receives, conceals, or retains the same with intent to convert it to his use or the use of another" (emphasis added). The word "so" is pivotal.
 
 
 143
 Defined as "such as has been specified or suggested", Webster's Third New International Dictionary 2160 (1971), the word "so", as used in § 1163's second paragraph, refers back to the first paragraph, which requires that the property must be taken from "any Indian tribal organization or intrusted to the custody or care of any officer, employee, or agent of an Indian tribal organization". Had congress omitted the word "so", we would agree with the government that it need only show that the defendants had the intent to receive money that had been stolen. But by including "so", congress added a requirement that the government demonstrate the defendants' knowledge that the stolen money they intended to receive belonged to the tribal organization.
 
 
 144
 The government contends that the reference to Indian tribal organizations in the first paragraph is intended only to confer federal jurisdiction over this offense, relying on 18 U.S.C. § 641, the statute which criminalizes the theft and receipt of federal government property. The government notes that this court, and others, have repeatedly held that § 641's reference to the federal government in that statute serves only as a predicate for federal jurisdiction. See United States v. Jermendy, 544 F.2d 640, 641 (2d Cir.1976) (government need not demonstrate "knowledge on the part of the defendant that the property he has stolen was in fact Government property"), cert. denied, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). See also United States v. Howey, 427 F.2d 1017, 1018 (9th Cir.1970) (§ 641 codifies common-law crimes of larceny and embezzlement and only requires that defendant know that property did not belong to him).
 
 
 145
 While we agree that § 641's reference to the source of the stolen property serves solely as a jurisdictional prerequisite, this is not the statute before us today, and there are good reasons to decline the government's invitation to incorporate its analysis into § 1163.
 
 
 146
 First, the statutory language of the two provisions differs in a significant way. Section 641 provides in relevant part:
 
 
 147
 Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States [or of its agencies]; or Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted * * * [shall be guilty of a crime].
 
 
 148
 18 U.S.C. § 641 (emphasis added). While the first paragraphs of §§ 641 and 1163 are substantially similar, their second paragraphs differ significantly. Section 641's second paragraph requires only that a defendant know that the property that she has received has been "embezzled, stolen, purloined or converted". Section 1163's second paragraph, in contrast, adds a further element because it requires that a defendant know that the property received has been "so * * * converted", i.e., converted from an Indian tribal organization.
 
 
 149
 Second, the government contends that because congress indicated in its legislative history that it had "modeled" § 1163 on other federal statutes such as § 641, see S.Rep. No. 2723, 84th Cong., 2d Sess., reprinted in 1956 U.S.C.C.A.N. 3841-42, the interpretation of § 641 should govern our disposition of this question. Much of the language of the two statutes is similar; congress clearly used some of § 641's language in drafting a statute to criminalize the theft of tribal funds. The fact that congress added the word "so" to the second paragraph of § 1163, however, demonstrates that congress, although influenced by § 641, also added an additional element to § 1163. Cf. United States v. Lin, 962 F.2d 251, 257 (2d Cir.1992) (concluding that congress, although influenced by "model act", sought to draft narrower statute by omitting some model act language).
 
 
 150
 The district court, by telling the jury that it need not determine beyond a reasonable doubt that defendants knew that the funds belonged to an Indian tribal organization, removed an essential element of the crime from the jury's consideration. This was plain error that requires reversal of the convictions on counts I and II of the indictment.B. Sufficiency of the Evidence.
 
 
 151
 Our conclusion that these convictions must be reversed, however, is not the end of the analysis, as we must determine whether the evidence at trial was sufficient to prove that the defendants knew that the funds had been taken from an Indian tribal organization. As indicated below, we conclude that the evidence was sufficient to prove this element as to each of the defendants. We address the defendants' other challenges to the sufficiency of the evidence on these counts as well.
 
 1. Linda Marks
 
 152
 The evidence at trial was sufficient for the jury to conclude that Linda Marks knew that the funds had been taken from an Indian tribal organization. The government introduced into evidence a receipt that included the signatures of Linda Marks and Geraldine Feeley, the payroll clerk for the Nation. The receipt memorialized Feeley's transfer of $60,541.94 to Linda Marks on January 11, 1988, and stated:
 
 
 153
 I, Geraldine Feeley, have at this point 1/11/88 and time 11:30 a.m. handed over all money to the Oneida Territory Community Council, the sum of $60,541.94. I hereby relinquish all responsibility for any monies, monies from 12/1, 1/11/88, also the combination of the safe.
 
 
 154
 Feeley testified that Linda Marks and the other signatories, Kandice Watson and Doreen Cornelius, had purported to revive the territorial council and that Linda Marks told Feeley that she would deposit the money in the territorial council's bank account, in order to ensure that the funds would "stay on the Territory". Given Feeley's position as the Nation's payroll clerk and Linda Marks's subsequent division of the received funds at the January 12 meeting, the jury could have reasonably concluded that Marks knew the funds--which, Feeley testified, were supposed to be deposited in the territorial council's bank account--had been misapplied from an Indian tribal organization.
 
 
 155
 Linda Marks, joined by Donald Marks, also claim that the bingo hall was not an Indian tribal organization. This argument is meritless. The jury heard Charles Fougnier, a business committee member, testify that the bingo hall's business committee was the subject of a November 1987 meeting at which the Oneidas agreed to allow the business committee to continue operating on a temporary basis until a later meeting of the Nation. Further, Geraldine Feeley, the Nation's payroll clerk, testified that she worked on the payroll for both the bingo hall and the Nation. Since there is no dispute that the Oneida Nation is an Indian tribal organization, the jury could have concluded on this evidence that the bingo hall and its administration was subject to the direct authority of the Oneida Nation and that the defendants therefore received money from such a tribal organization.
 
 2. The Other Defendants
 
 156
 William Beglen, Otatdodah Homer, and Donald Marks all received money at the January 12, 1988, meeting, and they all claim that they believed that the territorial council that distributed the funds on January 12 was a legitimate Oneida entity. This argument essentially concedes the element on which the district court failed to instruct, namely, that the defendants were required to know that the funds had come from an Indian tribal organization. The sufficiency issue for them, therefore, boils down to these defendants' claim that they were legally entitled to that portion of the bingo hall funds that each of them received.
 
 
 157
 a. Homer claims that she believed that the money she received on that date, $1,050, was three weeks' back pay owed to her for her work on the Oneida's culture and recreation committee after her suspension in mid-November. The issue is concededly a close one: as Homer points out, she was employed by the Nation, her salary was paid by the business committee before her suspension, and she had sought her back pay for several weeks preceding the January 12 meeting where she received the money.
 
 
 158
 Nevertheless, Geraldine Feeley, the Nation's bookkeeper, testified that she had a receipt showing a payment of the back pay to Homer on January 8, 1992--four days before the bingo monies were parcelled out. The other two members of the cultural committee, Linda Hill and Irene Thomas, testified that they had received their back pay on January 8. While Feeley could not recall specifically whether she had paid Homer, the jury could have reasonably inferred from the receipt and the payments to Hill and Thomas, that Homer, too, had been paid on January 8, so that on January 12 she knew that she had no legal right to the funds.
 
 
 159
 Homer also challenges the sufficiency of the government's evidence of her participation in a conspiracy to receive the stolen tribal funds. While her knowledge of the full circumstances surrounding the organization and execution of the January 12, 1988, bingo hall meeting may have been limited, a conspirator is not required to know all the details of the conspiracy, see, e.g., United States v. Skowronski, 968 F.2d 242, 247 (2d Cir.1992), although the government must produce some evidence from which it can be inferred that the defendant had knowledge of and participated in the scheme. Id. at 247; see also United States v. Martino, 759 F.2d 998, 1002-03 (2d Cir.1985). Here, there was ample evidence that Homer attended the bingo hall meeting, and that she accepted $1,050 to which she was not entitled. This was sufficient to make her a co-conspirator, in that she knowingly joined, and furthered, the conspiracy by her participation in the distribution of funds.
 
 
 160
 b. Beglen also claims that he was legally entitled to the money he received. He testified at trial that he appeared at the bingo hall on January 12 to receive what he termed as a pay raise based on the business committee's favorable evaluation of his performance before he resigned his position with the bingo hall. A reasonable jury, however, could have discounted this self-serving statement. In his testimony, Beglen himself questioned the authority of the business committee, and there is no indication in the record that the business committee's favorable evaluation entitled him to the money he received. Hence, the jury could have concluded that Beglen did not believe that he was entitled to the money he received on that date.
 
 
 161
 As for Beglen's sufficiency challenge to his conspiracy conviction, Beglen did attend the meeting at which the tribal funds were distributed. Further, Geraldine Feeley testified that on the weekend of December 6, 1987, she had attended a meeting with Beglen, Donald Marks, and others at Beglen's apartment in Canastota, New York. Feeley recalled that the discussion included a plan to keep the bingo hall money on The Territory until the next Nation meeting. Beglen's involvement with the controversy surrounding the business committee's authority and his effort to keep the bingo hall funds on The Territory, combined with the receipt of the money at the January 12, 1988, meeting, supported a finding of his participation in the conspiracy.
 
 
 162
 c. Donald Marks claims that he was legally entitled to the funds, but the evidence supported a finding that he knew the funds had been illegally taken. First, Linda Hill testified that Donald Marks told her at the January 12 meeting that the money was being divided in order to thwart the United States marshals who, Marks said, were going to arrive on The Territory to take over the bingo hall and its funds. From this alone, the jury could have concluded that Marks knew that the division of the funds was not a legitimate activity. Further, Marks claimed that the $28,000 that he received on January 12 constituted $18,000 for back pay when he served as the head of the Nation's security, and $10,000 for his original investment in the bingo hall. Marilyn John, however, testified that Marks was not entitled to the return of his investment until 1990, or five years after the bingo hall's 1985 opening. Thus, the jury could have concluded that Marks received at least the $10,000 at the 1988 meeting knowing that he was not entitled to the money at the time.
 
 
 163
 We therefore conclude that there was sufficient evidence for the jury to find that all three of these defendants--Homer, Beglen, and Marks--received from a tribal organization money that they knew they were not legally entitled to. We reverse the convictions on counts I and II for the omission of an essential element from the jury instructions and, because there was sufficient evidence to convict each one under a proper instruction, remand to the district court for a new trial.
 
 VI. PERJURY
 
 164
 William Beglen, Donald Marks, and Linda Marks all challenge their perjury convictions for testimony given during the discovery phase of the Nation's civil suit. All three claim that the government improperly used as a basis for their perjury indictments depositions that were unsigned. Linda Marks also claims that her perjury conviction was based on testimony given in response to ambiguous questions asked in the deposition. Beglen and Donald Marks claim that the evidence was insufficient to support their perjury convictions.
 
 
 165
 A. Use of Unsigned Depositions.
 
 
 166
 The defendants raise a series of meritless objections to basing their perjury prosecutions on statements that they had made under oath in the course of depositions taken in the pending civil litigation. The depositions could be used, whether or not the defendants had signed them as required by Fed.R.Civ.P. 30(e). The defendants' deposition testimony, presented through the court stenographers who transcribed the deposition proceedings, showed that each of the perjuring defendants was placed under oath, and that each gave the answers that were charged in the indictment to be false. This was a sufficient foundation to support the perjury charges.
 
 
 167
 B. Ambiguous Questions.
 
 
 168
 Although it is the province of the jury to determine whether a witness believed that the testimony she gave in response to a particular question was false, see United States v. Lighte, 782 F.2d 367, 372 (2d Cir.1986), we may reverse a jury's verdict of perjury if we determine that a line of questioning is so fundamentally ambiguous that "the answers associated with the questions posed may be insufficient as a matter of law to support the perjury conviction". Id. at 375.
 
 
 169
 "A question is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.' " Id. (quoting United States v. Lattimore, 127 F.Supp. 405, 410 (D.D.C.), aff'd per curiam by an equally divided court, 232 F.2d 334 (D.C.Cir.1955)). In evaluating a defendant's challenge to a question's clarity, we need to look at both the questions posed and the answers given in the context of the testimony as a whole. " 'If the response given was false as the defendant understood the question, his conviction is not invalidated by the fact that his answer to the question might generate a number of different interpretations.' " Lighte, 782 F.2d at 375 (quoting United States v. Williams, 552 F.2d 226, 229 (8th Cir.1977)).
 
 
 170
 We now apply these standards to the perjury conviction of Linda Marks.
 
 
 171
 During her deposition, Linda Marks was asked about her role in the division of the bingo hall proceeds, and whether she had received any of the funds:
 
 
 172
 Question: Now, in January, 1988, this is when the order was issued or at anytime during the month did you receive any money that had been in the bingo hall?
 
 
 173
 Answer: No.
 
 
 174
 Question: Let me make sure that I understood your testimony. You did not take custody of any money that had been in the bingo hall at anytime in January, 1988; is that correct?
 
 
 175
 Answer: Let me think about that. I have to stop and think of the dates. Okay, I can't remember on dates. I vaguely remembers [sic ] that I was taking care of--I had taken care of the smoke shop, but I hadn't--I wasn't assigned money or anything. I just would like take care of it, but then it stayed there.
 
 
 176
 Question: It stayed where?
 
 
 177
 Answer: At the smoke shop.
 
 
 178
 Question: Did you receive any money in January, 1988?
 
 
 179
 Answer: That I personally received any?
 
 
 180
 Question: In any capacity, did you receive any money proceeds from the bingo hall in January, 1988?
 
 
 181
 Answer: I don't recall.
 
 
 182
 (emphasis added).
 
 
 183
 The underscored question and answer formed the sole basis for Marks's perjury conviction. However, the subsequent questions asked of her indicate that there was some confusion as to whether the questioner was referring to Linda Marks in her personal capacity, or as an employee of the smoke shop, or as a member of the purportedly legitimate territorial council, which had received the funds and then distributed them at the January 12, 1988, bingo hall meeting, albeit to people other than Linda Marks.
 
 
 184
 In Lighte, the government prosecuted defendant for perjury in his grand jury testimony. The examiner "failed to differentiate between Lighte's actions as a trustee and those which he undertook in an individual capacity." Id. at 375. We observed that before the grand jury the defendant "interpreted each question as directed to him in an individual capacity. While some undoubtedly were, others were not." Id. We concluded that the examiner's lack of precision in phrasing the queries caused some of the questions to be fundamentally ambiguous, and we reversed Lighte's perjury conviction.
 
 
 185
 The government argues that, when placed in context, the contested question is not ambiguous. It notes that later in the deposition, Linda Marks admitted that her signature was on the document that acknowledged her receipt of $60,541.94 from Geraldine Feeley, the Nation's payroll clerk. Despite recognizing her signature, Marks testified at the deposition that she never received that money, and that she did not recall attending the meeting at which the money was distributed.
 
 
 186
 The issue, however, is not the unclear, contradictory, and perhaps evasive answers that Marks gave during the rest of her deposition. Rather, the issue is whether the single question on which the government chose to base the perjury charge was ambiguous. We conclude that it was.
 
 
 187
 Although Marks replied "no" to whether she received money that had been in the bingo hall in January 1988, her subsequent statement that she would "take care" of the money in the smoke shop indicates that she might have handled the Nation's funds in something other than a personal capacity. Further, her need to clarify the subsequent question, "Did you receive any money in January, 1988?", confirms our conclusion that the initial question was ambiguous. While there may have been some basis for a perjury charge in Linda Marks's other responses to more precise questions at the deposition, the government did not base its perjury charge on those answers. Thus, the subject question's lack of specificity carries it from the realm of imprecision into the terrain of fundamental ambiguity, see Lighte, 782 F.2d at 376, and we reverse Linda Marks's conviction on count XII.
 
 
 188
 C. Other Challenges to the Perjury Convictions.
 
 
 189
 Beglen and Donald Marks also challenge their perjury convictions. Beglen claims that his answers were literally true and that his conviction should therefore be reversed. Marks contends that the evidence was insufficient to demonstrate that he had knowledge of the falsity of his answers. Both challenges, however, fail.
 
 1. Beglen
 
 190
 Beglen was convicted on the basis of two questions and two answers:
 
 
 191
 Question: All right. Here's my question, next question: Did you take any of the money that was in the Bingo Hall on December 4, 1987? At any time, did you take any of the money?Answer: No.
 
 
 192
 Question: No is your answer?
 
 
 193
 Answer: Huh-uh.
 
 
 194
 Beglen claims that his answers to these questions were literally true, and therefore could not serve as the basis for his perjury conviction. He relies on Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), in which the defendant had been asked at a bankruptcy hearing whether he had any Swiss bank accounts. Bronston answered "no". He was then asked, "Have you ever?", and answered that "The Company had an account there for about six months, in Zurich." Id. at 354, 93 S.Ct. at 598. The government, which had demonstrated that Bronston at one time had maintained a personal bank account in Switzerland prior to the bankruptcy-hearing testimony, argued that Bronston's unresponsive answer was perjurious. The Court, however, concluded that Bronston could not be convicted for the unresponsive, but literally true, answer, even if it was false by " 'negative implication' ". Id. at 361, 93 S.Ct. at 601.
 
 
 195
 Beglen argues that his perjurious answer was literally true, because there is no evidence placing him at the bingo hall on December 4, 1987, and because that date was insignificant in the context of this case. The gravamen of Beglen's argument, then, is that even if he took money from the bingo hall, it was not taken on December 4. This argument fails.
 
 
 196
 First, the jury was properly instructed as to the Bronston defense and, given that two answers formed the basis for the perjury charges against Beglen, we are not faced here with a situation where it is unclear as to which answers the jury found perjurious. Cf. Lighte, 782 F.2d at 374 (in absence of special verdict, court unable to conclude which of several statements the jury considered to be perjurious). Construing the evidence in a light most favorable to the government, see id. at 374, Beglen's negative response to the question, "At any time, did you take any of the money?", was not literally true.
 
 
 197
 Second, Beglen contends that the indictment's reference to December 4 as the date given in the question posed at deposition is significant, because he was not in the bingo hall on that date. As the government points out, the reference to December 4 in the indictment was incorrect; the stenographer at trial read her record of the deposition and indicated that the date referred to in the question was December 6, the day that Beglen and others prevented an employee from leaving the bingo hall and depositing the funds at an off-territory bank.
 
 
 198
 The discrepancy between the date mentioned in the indictment and that recited at trial, however, does not change the fact that Beglen's answer to the question constituted a denial of taking any of the funds that were in the bingo hall after a particular date, whether it was December 4 or December 6. When the question and answer are viewed in the context of the line of questioning as a whole, see Lighte, 782 F.2d at 373, it is clear that Beglen consistently denied that he took the bingo hall funds that had been in the bingo hall when he and his allies disrupted its operations in order to keep the money on The Territory. Given the evidence demonstrating that the money distributed on January 12, 1988, had come from the bingo hall, and that Beglen had received what he termed as a "pay increase" on January 12, the jury was entitled to determine that these funds had been present in the bingo hall in December, and that Beglen therefore perjured himself when he said he did not "at any time" receive money that had been in the bingo hall, whether that date was December 4 or December 6.
 
 2. Donald Marks
 
 199
 Marks's claim that the evidence was insufficient to support his perjury conviction also fails. He was convicted on two counts of perjury for two statements: (1) that he did not receive any money from the bingo hall, aside from interest on his investment and his wage payments (count X); and (2) that he answered "no" when he had been asked at the deposition whether he ever attended a meeting where the Canadian Oneidas had been asked to leave the New York territory (count XI).
 
 
 200
 To secure a perjury conviction, the government must prove "[t]he accused's knowledge of the falsity of his statements at the time he made those statements". United States v. Sweig, 441 F.2d 114, 117 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971). As we recognized in Sweig, if a defendant does not admit to this knowledge, "the only way a defendant's knowledge of the falsity of his statements can be proved is through circumstantial evidence." Id. (citations omitted). The evidence was sufficient to justify the jury's finding that Marks knew that his deposition statements were false at the time that he made them.
 
 
 201
 First, the jury was justified in determining that Marks's statement that he did not receive money other than his interest payments and his wages was false. Kandice Watson, for example, testified at trial that Marks had received his $10,000 initial investment in the bingo hall at the January 12, 1988, meeting. From this evidence, the jury was entitled to find that Marks knew that he had perjured himself when he said he had only received interest on his investment.
 
 
 202
 As to count XI, the evidence showed that Marks had attended at least one Nation meeting where he had defended the presence of the Canadian Oneidas on the territory. Gilbert Stout testified that, at an Oneida meeting in December 1987, there were suggestions that the tribal conflict be resolved among The Territory's residents only. Marks, Stout testified, responded by stating that the Canadian Oneidas were needed on The Territory. From this, the jury could have concluded that Marks knew he was perjuring himself when he denied having attended meetings where the presence of the Canadian Oneidas was challenged. Thus, Marks's challenge to the sufficiency of the evidence supporting his perjury convictions fails.
 
 VII. OTHER SUFFICIENCY CLAIMS
 
 203
 Defendants' remaining claims are directed to the sufficiency of the evidence supporting the other counts. In reviewing a sufficiency challenge, we evaluate the evidence in the light most favorable to the government and credit every possible inference in its favor. United States v. Stanley, 928 F.2d 575, 576 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). We must therefore affirm defendants' convictions if, after conducting such a review of the evidence, we determine that "any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).
 
 
 204
 In proving the existence of a conspiracy, the government need not demonstrate that the defendants formally agreed to the conspiracy; instead, "it is sufficient if the government can demonstrate that the defendant acted together with others to realize a common goal." United States v. Montour, 944 F.2d 1019, 1025 (2d Cir.1991) (citation omitted). The government must show that the defendants agreed upon the essential nature of the conspiracy, United States v. Bagaric, 706 F.2d 42, 63 (2d Cir.), cert. denied, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), and circumstantial evidence is sufficient to establish the defendants' knowledge of the conspiracy and their participation in it. See, e.g., United States v. Villegas, 899 F.2d 1324, 1338-39 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990). Applying these principles, we now turn to the arson and anti-riot act convictions.
 
 
 205
 A. Arson Conspiracy.
 
 
 206
 Beglen, John Kane, Donald Marks, and Linda Marks all argue that the evidence was insufficient to support the jury's findings on count VII, conspiring to maliciously damage a building used in interstate commerce by fire or explosives. See 18 U.S.C. § 844(i). The evidence certainly was sufficient to demonstrate that an arson was committed and, for the following reasons, we conclude that the evidence also was sufficient to support findings that a conspiracy existed and that each of these defendants was aware of, and participated in, the plan to burn down the bingo hall on February 21, 1988.
 
 1. John Kane
 
 207
 The jury heard Charles Fougnier, a business committee member, testify that on January 4, 1988, John Kane told him that "We'll burn [the bingo hall] before you get it back". Karen Halbritter also recalled at trial that Kane was part of a group--including Donald Marks--that broke into the bingo hall on January 9, 1988. And, on February 20, 1988, the day before the fire, Keith Boylan saw John Kane in the hall, securing a ladder upon which Donald Marks was standing. Marks, Boylan testified, was peering through a hole created by the removal of a ceiling tile.
 
 
 208
 The jury could have viewed Kane's statements about burning the bingo hall as evidence of a plan to eventually burn the bingo hall, and Kane's participation in the bingo hall break-in and his activities in the hall on the day before the fire are actions that could reasonably be viewed as furthering the agreement.
 
 2. Donald Marks
 
 209
 Like John Kane, Donald Marks was in the bingo hall the day before the fire, peering into the ceiling. Diane Schenandoah testified that, on the day before the fire, she spotted several of the defendants' cars parked in front of the bingo hall, including William Beglen's red Camaro, and a station wagon owned by Donald and Linda Marks. Finally, after the fire Linda Hill saw Donald Marks in Ontario at an Oneida festival, and Marks told her, "You should have seen the thing go up, just the whole fuckin' place blew right up."
 
 
 210
 In the context of the other evidence, Marks's activities in the bingo hall prior to the fire, together with his post-fire statements, constituted evidence sufficient to show that he was aware of a plan to burn the bingo hall and that he participated in that plan.
 
 3. Linda Marks
 
 211
 As for Linda Marks, Doreen Cornelius testified that at the January 12, 1988, bingo hall meeting, Linda Marks said that Cornelius need not put her resignation from the territorial council on paper because "we're going to burn everything anyway." Further, on the night before the fire, at 10 p.m., Linda Marks was in the bingo hall and told Scott Jones Helft, another Oneida, to stay out of the bingo hall, which Linda Marks said was closed. The jury could reasonably have concluded from this that Linda Marks was a conspirator.
 
 4. William Beglen
 
 212
 William Beglen also contends that the government's only proof of his involvement with the conspiracy was that Diane Schenandoah had testified that his car was parked outside the bingo hall on the night before the fire. There is other evidence, however, that connects Beglen with the conspiracy. Beglen's aunt, Elizabeth Roberts, testified that she had spoken to Beglen on February 2, 1988, and he told her that the bingo hall would have been destroyed prior to that date "except Ray Halbritter would have gotten rich off the insurance." Again, the evidence was sufficient to demonstrate that Beglen had knowledge of a plan to burn down the bingo hall, and the jury could reasonably have concluded that the presence of his car at the bingo hall on the day before the fire demonstrated his intent to carry out that plan.
 
 
 213
 B. Anti-riot Act Convictions.
 
 
 214
 William Beglen, Brenda Kane, John Kane, Donald Marks, and Linda Marks all challenge the sufficiency of the evidence supporting their convictions on count III, conspiring to violate the anti-riot act; all but Linda Marks also challenge their convictions on count IV, aiding and abetting a violation of the anti-riot act.
 
 
 215
 1. Standard of Review.
 
 
 216
 Linda Marks, Donald Marks, and Brenda Kane claim that the appropriate standard of review for their sufficiency claims is strictissimi juris. In United States v. Dellinger, 472 F.2d 340 (7th Cir.1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), the seventh circuit noted that strictissimi juris applies "[w]hen the group activity out of which the alleged offense develops can be described as a bifarious undertaking, involving both legal and illegal purposes and conduct, and is within the shadow of the first amendment". Id. at 392.
 
 
 217
 This standard therefore requires a court to determine if "there is sufficient direct or circumstantial evidence of the defendant's own advocacy of and participation in the illegal goals of the conspiracy and [the court] may not impute the illegal intent of alleged co-conspirators to the actions of the defendant." Montour, 944 F.2d at 1024 (citations omitted). Strictissimi juris, therefore, should be applied in situations where the court needs to determine whether "the ultimate objective of a group, of which the defendant is a member, is legal, but the means chosen to accomplish that end involve both legal and illegal activities." Id.
 
 
 218
 The record belies the defendants' attempts to cast their conduct as political action relating to their efforts to maintain Oneida sovereignty. Dellinger, upon which defendants principally rely, involved prosecutions "based wholly on the making of speeches." Dellinger, 472 F.2d at 359. While some defendants made comments and speeches that, the government alleged, constituted overt acts in furtherance of the conspiracy to incite a riot, they also participated in public disturbances that included the threatening gathering in front of the house of business-committee-member Charles Fougnier, the attack on the Halbritter gas station, and the bingo hall break-in. Further, the purpose of this conspiracy was to commit violence against and to threaten those who disagreed with the defendants. Since both the ends sought and the means used by this group were illegal, see, e.g., Montour, 944 F.2d at 1024; United States v. Cerilli, 603 F.2d 415, 422 (3d Cir.1979), cert. denied, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), we reject the use of strictissimi juris in favor of our normal standard of review.
 
 
 219
 2. Sufficiency of the Evidence.
 
 
 220
 Viewing the evidence in the light most favorable to the government, we conclude that a reasonable jury could have found the defendants guilty on both counts.
 
 
 221
 The anti-riot act requires the use of a facility of interstate commerce with the intent
 
 
 222
 (A) to incite a riot; or
 
 
 223
 (B) to organize, promote, encourage, participate in, or carry on a riot; or
 
 
 224
 (C) to commit any act of violence in furtherance of a riot; or
 
 
 225
 (D) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot * * *.
 
 
 226
 18 U.S.C. § 2101(a). The government also must demonstrate that the defendant committed another overt act for "any purpose specified" in subparagraphs (A) through (D).
 
 
 227
 a. Use of a Facility of Interstate Commerce.
 
 
 228
 The use of a facility of interstate commerce is an essential element of an anti-riot act offense. 18 U.S.C. § 2101(a); see Dellinger, 472 F.2d at 358-59. The statute requires the government to prove a defendant's intent at two points in time--when the defendant uses a facility of interstate commerce with the intent to incite a riot, and when the defendant commits an overt act to further any of the purposes articulated in subparagraphs (A) through (D). As the court in Dellinger recognized, the statute "surely does not require that the situation, nature, and details of the riot contemplated at the time of travel remain exactly identical until the time of the overt act", Dellinger, 472 F.2d at 393, but it does require that the nature of the contemplated riot "be sufficiently similar so that it is reasonable to say the later is the same as or the evolving product of the one intended earlier." Id. at 393-94.
 
 
 229
 We turn first to the defendants' intent at the time that Donald Marks used a facility of interstate commerce. Through the testimony of Duane Hill, the government demonstrated that Donald Marks on December 6, 1987, made an international call to summon the Canadian Oneidas to The Territory. Hill recalled at trial that, within a few days of the telephone call, the first group of Canadians arrived on The Territory.
 
 
 230
 While the evidence does not demonstrate that Donald Marks called the Canadian Oneidas with plans to create any particular public disturbance that occurred after the phone call, the evidence of Donald Marks's subsequent actions demonstrates that he sought to disrupt life on The Territory by introducing the Canadian Oneidas into the controversy.
 
 
 231
 Gilbert Stout, for example, recalled at trial a meeting during the week of December 6, 1987, after the Canadians had arrived on The Territory, at which Donald Marks said that the Canadians were there to help, even though other Oneidas suggested that the problem should be handled among The Territory's residents. And Sherri Edwards, another Oneida, testified that at a December 20, 1987, Nation meeting, Donald Marks defended the Canadian Oneidas' presence on The Territory. Given the pivotal role that the Canadian Oneidas played in the subsequent disruptions, the jury could have concluded that Marks's defense of them demonstrated his intent to create a public disturbance on The Territory when he made the telephone call.
 
 
 232
 Brenda Kane, however, argues that the government is required to demonstrate that all defendants, not just Marks, used a facility of interstate commerce. We have concluded previously, however, that the government does not have to prove the interstate commerce element as to each defendant where the defendants are charged with aiding and abetting the commission of an offense with an interstate commerce element.
 
 
 233
 In United States v. Sigalow, 812 F.2d 783 (2d Cir.1987), the defendant was convicted of aiding and abetting a travel act violation, see 18 U.S.C. § 1952, and we concluded that he "need not have assisted in the use of interstate facilities", so long as the scheme had substantial interstate connections. Id. at 785. The government was therefore not required to prove that the defendant had knowledge of the violation of the travel act's jurisdictional element. Id. at 786. Here, the proof that Donald Marks used a facility of interstate commerce to invite the Canadian Oneidas to come to The Territory was sufficient to prove the interstate element of the crime as to all the defendants.
 
 
 234
 Thus, the evidence showed that Donald Marks had made a phone call in interstate commerce with the intent to promote a riot on The Territory, and this action may be attributed to the other defendants charged with the underlying anti-riot act offense in count IV.
 
 
 235
 b. Riots.
 
 
 236
 The government also demonstrated that each defendant convicted on count IV--Beglen, John Kane, Brenda Kane, and Donald Marks--had committed an overt act in furtherance of a riot, defined in the anti-riot act as
 
 
 237
 a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual.
 
 
 238
 18 U.S.C. § 2102(a).
 
 
 239
 Three gatherings of Oneidas during a period of one week are cited by the government as fitting this definition of a riot, and we agree. These incidents were: (1) the January 4, 1988, gathering of more than 30 Oneidas in front of the home of business-committee-member Charles Fougnier; (2) the January 5, 1988, attack on the Halbritter gas station; and (3) the January 9, 1988, bingo hall break-in, during which Clint Hill and Jerome Waterman were assaulted. Although the government did not charge the gathering at Fougnier's home in the indictment, it was still entitled to prove that the incident was an overt act that served to further defendants' conspiracy to violate the anti-riot act. See United States v. Lam Lek Chong, 544 F.2d 58, 63 (2d Cir.1976), cert. denied, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977). Moreover, defendants' participation in the gathering in front of Fougnier's house, as well as the other incidents, were sufficient to demonstrate that they aided and abetted the other defendants in committing the underlying anti-riot act violation.
 
 
 240
 All these events involved groups larger than three people where property was damaged, or where threats were made with the ability to immediately execute such threats. Moreover, the riots shared common goals: to intimidate those who disagreed with the defendants and to disrupt businesses in The Territory.
 
 
 241
 c. Commission of an Overt Act in Furtherance of a Riot.
 
 
 242
 Beglen, Brenda Kane, John Kane, and Donald Marks each participated in one or more of these events on The Territory, and their activities were sufficient to constitute overt acts for the purpose of aiding and abetting others in inciting, participating in, carrying on, or committing any act of violence in furtherance of a riot.
 
 
 243
 The Confrontation at Fougnier's House: Charles Fougnier testified that 30 or 40 Oneidas appeared at his house in Chittenango, New York on January 4, 1988. He recalled that Beglen, Brenda Kane, John Kane, and Donald Marks were among a dozen Oneidas gathered on his front porch. The rest of the group was off the porch in front of his house.
 
 
 244
 Fougnier recalled that Marks sought the Nation's financial records and checkbooks, and that both John Kane and Donald Marks warned him that they would return if they did not find the checkbooks in the Nation's offices in Canastota, New York. John Kane also told Fougnier that the group would burn the bingo hall "before you get it back". From these actions, the jury could have reasonably concluded that Marks and Kane were threatening Fougnier, in an assemblage of three or more persons. Additionally, the presence of Beglen and Brenda Kane on Fougnier's front porch with John Kane and Donald Marks could have led a reasonable jury to conclude that these two were aiding and abetting Marks and John Kane in threatening Fougnier, and that their attendance--along with the 30 or 40 others gathered outside Fougnier's house--would enable Marks and Kane to immediately make good on their threats to Fougnier.
 
 
 245
 Beglen's conduct was not limited to his appearance on Fougnier's porch. The jury could have viewed evidence regarding his and John Kane's comments to Linda Hill about the firing of a BB gun at the Halbritter house and Beglen's statements about Oneida sovereignty to reporters as evidence of his status as an active participant in the events on The Territory, rather than as a mere bystander. Further, Beglen was present with Donald Marks and others who confronted a television crew in the bingo hall on January 28, 1988. Again, Beglen's presence at this meeting of more than three people could be viewed by a reasonable jury as aiding and abetting others participating in a riot, or public disturbance, as defined by the statute.
 
 
 246
 The Attack on the Halbritters' Gas Station: On January 5, 1988, Brenda Kane, Donald Marks, and approximately 25 Oneidas arrived at the gas station owned by Ray Halbritter's family. Terrance Frederick, the attendant, testified that Donald Marks and Martin Dockstater asked him for the location of the switches to the gas pumps. After Frederick advised him that the area was off-limits, Marks then entered the gas station's cash hut, which contained the switch boxes and cashier equipment, and which had a sign on the window marked "Employees Only". Karen Halbritter, Ray Halbritter's sister, testified that after she saw Brenda Kane exit the cash hut, she peered into the cash hut, and saw two men that she did not recognize going through papers inside the hut.
 
 
 247
 Sergeant David Wheeler of the Oneida City Police Department testified that he saw one person in the group wielding a two-by-four piece of wood at "what looked like a power box" and that immediately thereafter the lights on the pumps went out.
 
 
 248
 From this testimony, the jury could have concluded that this was a public disturbance within the meaning of the statute, in an assemblage of three or more persons which committed acts of violence that resulted in damage to another person's property. The jury could also have concluded that Donald Marks sought to close down the gas station, and that Brenda Kane's presence aided and abetted Marks in achieving that goal.
 
 
 249
 The evidence refutes Brenda Kane's contention that her presence at the attack on the gas station was the only basis for her conviction. Viewing the events as a whole, Brenda Kane's presence on Charles Fougnier's porch while others made threats, her proximity to the bingo hall immediately after the break-in, and her participation in the attack on the gas station all served to support the defendants' goal of creating public disorder.
 
 
 250
 The Bingo Hall Break-in: On January 9, 1988, another "riot" within the meaning of the statute occurred at the bingo hall. Karen Halbritter testified that she saw John Kane and Donald Marks in front of the bingo hall along with Martin Dockstater, who broke down the door. Clint Hill, an Oneida, went to investigate the disturbance and was accompanied by Jerome Waterman, an Onondaga Indian who resided on The Territory.
 
 
 251
 Hill testified that Dockstater told Waterman to leave The Territory, and when Waterman refused, some of the defendants attacked both Hill and Waterman. Donald Marks and John Kane both assaulted Waterman, and the jury could have concluded that the commotion at the bingo hall, with a group of three or more people, constituted a public disturbance under the anti-riot act (count IV).
 
 
 252
 As for the conspiracy conviction (count III), these defendants' activities and their presence at one or more of these "riots" was also sufficient to demonstrate that they were aware of a plan to cause disruption on The Territory, and their actions constituted participation in the conspiracy that served to further that common plan.
 
 
 253
 Finally, the evidence also supports Linda Marks's conviction for conspiring to violate the anti-riot act. While the jury acquitted Linda Marks of the underlying anti-riot offense contained in count IV, perhaps because she did not appear at any of the "riots" that the government proved at trial, the evidence was nevertheless sufficient to convict her for conspiring to violate the anti-riot act. Doreen Cornelius testified that on the day that the bingo hall was broken into and that Jerome Waterman and Clint Hill were assaulted, Linda Marks demonstrated her knowledge of the conspiracy when she told Cornelius that Donald Marks and the Canadians were going to "get rid of the people that had taken over the bingo". Such a statement, followed by the actual occurrence of the break-in, when considered in light of Linda Marks's many actions in support of the riotous activities, could reasonably be viewed by the jury as advance knowledge of, support of, and participation in the defendants' plan.
 
 
 254
 The evidence, then, established the existence of two separate conspiracies: the conspiracy to damage the bingo hall, and the conspiracy to violate the anti-riot act. It was also sufficient to convict four defendants--Beglen, Brenda Kane, John Kane, and Donald Marks--of the substantive anti-riot act violation.
 
 
 255
 We have considered defendants' other arguments and deem them to be meritless.VII. SUMMARY AND CONCLUSION
 
 
 256
 The district court properly had jurisdiction over all defendants and all offenses. We reverse the judgments of conviction against William Beglen, Otatdodah Homer, Donald Marks, and Linda Marks on counts I and II, conspiring to receive and receiving funds stolen from an Indian tribal organization, and we remand those counts to the district court for further proceedings not inconsistent with this opinion. Linda Marks's perjury conviction on count XII is reversed and the count is dismissed, because the question that formed the basis of the charge was fundamentally ambiguous. All other convictions are affirmed.