UNITED STATES of America,
Plaintiff–Appellee,

v.

John Nez BEGAY, Donald Benally, Paul Kinlicheenie, Earl Roy Lee, Peter Mac-Donald, Sr., Ned M. McKensley, Alfred Scott, Sr., Anna Sorrell, Evangeline Begay Wauneka, Kee Ike Yazzie, Defendants–Appellants.

Nos. 93–10165, 93–10167 to 93–10175.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 4, 1994.

Decided Nov. 7, 1994.

---

488

Jess A. Lorono, Phoenix, AZ, for defendant-appellant, John Nez Begay.

David M. Ochoa, Phoenix, AZ, for defendant-appellant, Donald Benally.

David L. Titterington, Asst. Federal Public Defender, Phoenix, AZ, for defendant-appellant, Paul Kinlicheenie.

Dana Carpenter, Phoenix, AZ, for defendant-appellant, Earl Roy Lee.

Bruce S. Griffin, Aspey, Watkins & Diesel, Flagstaff, AZ, for defendant-appellant, Peter MacDonald, Sr.

Douglas M. McVay, Phoenix, AZ, for defendant-appellant, Ned M. McKensley.

Michael Morales, Phoenix, AZ, for defendant-appellant, Alfred Scott, Sr.

C. Kenneth Ray, Jr., Phoenix, AZ, for defendant-appellant, Anna Sorrell.

George F. Klink, Phoenix, AZ, for defendant-appellant, Evangeline Begay Wauneka.

Stephen I. Leshner, Van O'Steen and Partners, Phoenix, AZ, for defendant-appellant, Kee Ike Yazzie.

Janet Napolitano, U.S. Atty. for Dist. of Arizona, Georgia B. Ellexson, Chief, Appellate Section, and Joseph J. Lodge, Asst. U.S. Atty., Phoenix, AZ, for plaintiff-appellee.

Before: SNEED, PREGERSON, and WIGGINS, Circuit Judges.

PREGERSON, Circuit Judge:

## BACKGROUND

Appellants were among thirty-two individuals charged with various criminal offenses arising from events leading up to and including the civil disturbance of July 20th, 1989, at the Navajo Nation Administration and Finance Building in Window Rock, Arizona. On that day, supporters of Appellant Peter MacDonald, Sr., the former Chairman of the Navajo Tribal Council of Delegates, engaged in a violent confrontation with tribal police. During the confrontation, several tribal police officers were assaulted and injured, their police vehicles were vandalized, the Navajo Nation Administration and Finance Building was entered and ransacked, and documents were removed from that building. Two demonstrators were killed.

On July 30, 1991, Appellants were indicted on numerous offenses arising from the July 20th incident. The charges included conspiracy and various counts of assault, robbery, kidnapping, and burglary. The trial, which lasted nearly four months, began on July 9, 1992. At trial, the Appellants contended that the events at issue were the result of a tribal political dispute, and that none of the actions taken by MacDonald or any of the other Appellants were illegal because MacDonald had been improperly removed from the office of Chairman. On November 12, 1992, after deliberating for twenty-one days, the jury returned guilty verdicts against all defendants, although it did not reach verdicts on some counts. The District Court granted the Government's motions to dismiss the counts

on which the jury was unable to reach verdicts.

### 1. The Alleged Conspiracy

The Navajo Tribal Council of Delegates (the "Council") is the governing body of the Navajo Nation and is similar in function to the Congress of the United States. The Council is elected by tribal members from the various chapters or districts of the Navajo Nation. At the time of the events at issue, the Council was composed of eighty-eight delegates. The Council meets four times a year. When the Council is not in session, its business is carried out by various standing committees, including the advisory committee, which sets the agenda for the Council meetings.

The Council Chairman, who is elected at large, presides over the Council, is responsible for carrying out the programs and policies of the Council, controls its agenda, determines when matters are put to a vote, and decides which delegates will speak and when. Further, the Chairman appoints delegates to, and designates the chairmen of, the various standing committees of the Council, and in many instances may unilaterally remove delegates from any committee.

The events which led up to the July 20th incident are as follows: Peter MacDonald, Sr., served as Chairman of the Council for three four-year terms between 1970 and 1982, and he won reelection to that position in 1986. The 1989 Winter Session of the Council was scheduled to begin on February 14th. In January and February of 1989, before the Winter Session had begun, the United States Senate Select Committee on Indian Affairs was investigating allegations of fraud and corruption in the Navajo Nation Tribal Government. This investigation focused in part on Peter MacDonald.[1] Mac-

Donald knew of this investigation, and knew that during the upcoming session, the Council planned to vote whether to place him on administrative leave pending the outcome of the Senate investigation.

The purpose of placing MacDonald on administrative leave was to give him the opportunity to clear his name, to protect the sovereignty of the Navajo tribe, and to maintain a credible tribal government. Council members were also concerned that the Council would lose credibility with the United States Congress if MacDonald was not placed on administrative leave pending the investigation's outcome.

To prevent a vote on the issue of MacDonald's administrative leave at the Winter Session, MacDonald and his supporters proposed a lengthy, twenty-five item agenda, during which MacDonald would recognize only those delegates who supported his continued chairmanship. MacDonald's strategy failed because the Council refused to approve the proposed agenda. In an attempt to avoid being stripped of all power, MacDonald offered to go on administrative leave if his Vice Chairman, Johnny Thompson, was named Chairman, and if MacDonald was provided an office, staff, and funds for legal assistance during the duration of his leave.

The Council turned down MacDonald's offer, and passed a resolution[2] that placed MacDonald on paid administrative leave and removed his legislative and executive authority. The Council had never before placed a tribal chairman or vice-chairman on leave, and the Navajo Tribal Code did not explicitly provide for such action. MacDonald's supporters claimed that the Council's action was improper. But there was precedent for this action because the Council had previously placed a high-ranking official on administrative leave due to suspected improprieties.[3]

---

1. This investigation resulted in the conviction of MacDonald on charges of racketeering, racketeering conspiracy, extortion by an Indian Tribal Official, mail fraud, wire fraud, and interstate transportation in aid of racketeering. MacDonald's convictions were affirmed on appeal in *United States v. MacDonald*, No. 92–10717, memo. dec., 1994 WL 5502 (9th Cir. Jan. 6, 1994).

2. A Council resolution is similar in effect to an Act of Congress.

3. Although, as Appellants point out, the procedure of administrative leave had not been used before by the Council to relieve a Chairman or Vice Chairman, the procedure had been used previously on a high-ranking Navajo official. In 1985, the Council placed Chief Justice Nelson McCabe of the Navajo Supreme Court on admin-

In the alternative, MacDonald's supporters argued that the Council's actions were improper because the Navajo Tribal Code, which contained a provision concerning the complete removal of a Chairman, required a two-thirds vote of the Council. In 1989, removal would have required the affirmative vote of fifty-nine out of the eighty-eight Council delegates. Although the Council had voted not to remove MacDonald but merely to place him on leave, he refused to accept the Council's actions in part because the vote for administrative leave was approved by only forty-nine votes.

Rather than accept the Council's decision, MacDonald sought to create his own government, independent of the Council. MacDonald instructed his Vice Chairman to appoint an advisory committee to be chaired by Appellant Donald Benally.[4] Thereafter, MacDonald and Benally met almost daily to try to return MacDonald to power. Further, MacDonald and Benally attempted to govern the Navajo Nation despite the fact that the Council was still in session and had appointed an Interim Council Chairman, Leonard Haskie.

Specifically, MacDonald directed Benally's committee to pass various resolutions to counteract all legislative action taken by the Council. These included resolutions terminating the Attorney General of the Navajo Nation for his failure to support MacDonald, rescinding all actions of the Council, directing MacDonald to exercise his authority as Chairman of the Council, and ordering the current Chairman pro tem and Vice Chairman pro tem to vacate their Council positions. Further, MacDonald instructed his staff to go to the chapter houses[5] and tell people that he had done nothing wrong, that he was still the Chairman, and that it was their government, not the government of the Council delegates.

The Council stopped MacDonald's signatory authority over tribal bank accounts. MacDonald believed that he could better regain control of the tribe if he could control the tribe's finances. Therefore, MacDonald had Benally's committee pass a resolution that authorized members of MacDonald's staff to take control of the Division of Administration and Finance and to direct the Navajo Division of Law Enforcement to enforce the resolution. Further, MacDonald directed his staff to attempt to locate tribal bank accounts which were still open to see if they could access the funds for MacDonald's use. MacDonald also instructed William Morgan, his appointee at the finance office, not to pay Council delegates who had voted against him.

At trial, Appellants contended that there was nothing improper in the actions taken by MacDonald and Benally's advisory committee because it was unclear who was legally in charge of the Navajo government. Thus, Appellants argued, MacDonald had as much right to run the Navajo government as did the Council. To support this contention, Appellants assert that there were conflicting rulings issued by the Navajo courts concerning the issue of MacDonald's authority to act as Chairman. The facts, however, do not support this view. All rulings issued in favor of MacDonald were done so exclusively by way of MacDonald's improper influence over certain judges and in clear contravention of Navajo law.

For example, on February 21, 1989, MacDonald persuaded his brother-in-law, Judge Brown, to issue a Temporary Restraining Order that prohibited the Navajo Tribal Council from enforcing its resolution placing MacDonald on leave, and reinstated Mac-

istrative leave pending the outcome of criminal charges against him. The stated purpose of this action was "to preserve the integrity of the courts of the Navajo Nation." It is noteworthy that Donald Benally, MacDonald's appointed advisory committee chairman and an Appellant in the present case, was a member of the Council's advisory committee that placed McCabe on administrative leave.

4. MacDonald's creation of this advisory committee was improper, whether or not MacDonald

was properly placed on administrative leave by the Council. An advisory committee, even if lawfully created, is without authority to act while the Council is in session. The Council remained in session until May 19, 1989.

5. A chapter house is similar to a town hall where people meet to discuss items of local interest. In 1989, there were approximately 100 chapter houses on the Navajo Reservation.

Donald as Chairman. The Navajo Supreme Court vacated Judge Brown's order three days later in part because it violated Canon 3 of the American Bar Association Code of Judicial Conduct, which the judges of the Navajo Nation had adopted. This canon mandates that a judge who is a blood relative of a party shall not participate in that party's case.[6] Later, on March 22, 1989, Judge Robert Yazzie of the Window Rock District Court issued an order restraining MacDonald and his staff from attempting to exercise any official powers or duties as employees or agents of the Navajo Nation. The order also restrained MacDonald and his staff from incurring any expenses on behalf of the Tribe, unless authorized by the Navajo District Court. The order further restrained MacDonald and his staff from entering or remaining in tribal buildings, except to remove personal belongings. MacDonald declared the order illegal, distributed a memo ordering his staff to remain in their offices twenty-four hours a day, and issued an order removing Judge Yazzie from the bench and appointing Judge Tonney Bowman as Judge Yazzie's replacement.[7] In addition, on March 24, 1989, Benally's committee attempted to reinstate Nelson McCabe as Chief Justice of the Navajo Supreme Court.[8] Following his "appointment" by MacDonald, McCabe signed various orders purportedly from the Navajo Supreme Court which were drafted by Benally and members of MacDonald's staff.

MacDonald and his staff continued to occupy the Chairman's office in violation of Judge Yazzie's order. On April 7, 1989, MacDonald was informed that Council supporters intended to march on the Chairman's office and wanted to speak to MacDonald. MacDonald instructed his staff to bring as many people as possible to create a "show of force," and instructed the staff to place old women in front of his group of supporters as protection. Several fights broke out that day between the Council supporters and MacDonald supporters. When MacDonald's secretary, Appellant Anna Sorrell, expressed concern about the fighting and asked MacDonald what he intended to do about it, MacDonald replied, "If that's what they want, that's what they'll get," and "If they want to fight, let them fight."

That evening MacDonald held a meeting at his house, which was attended by Appellant Ned M. McKensley, among others. MacDonald told those present that their cause needed lawyers who understood violence because there probably would be a violent overthrow of the government. MacDonald also indicated that he believed that the Bureau of Indian Affairs (BIA) was behind his removal from office.[9] Further, MacDonald advocated regaining control of the tribe's administration and finances. To this end, MacDonald directed his supporters to use the Navajo Nation's public radio to get more people to sit in at the Chairman's office to maintain control.

On May 17, 1989, Judge Yazzie made permanent the March 22nd Temporary Restraining Order against MacDonald and his supporters. Three days later, on May 20th, Navajo police officers, to effectuate the court order, went to the Navajo Nation Administration and Finance Building, which housed the Chairman's office, to evict MacDonald and his supporters. The police had a locksmith change the lock, and they strung a heavy metal chain across the entrance driveway to deny vehicle access.

---

6. The Navajo Supreme Court also ordered that the suit which MacDonald had filed against the Council to stall its decision to place him on leave be dismissed because, based on the doctrine of sovereign immunity, the Navajo District Courts have no jurisdiction over suits against the Navajo Nation absent the Navajo Nation's express consent.

7. Judge Tonney, who had previously served as a probationary judge for the children's court, was removed from that court on December 15, 1986, based on a finding by the then-current Council that Judge Tonney had failed to act in the best interests of Navajo children, had neglected his duties, and had resisted and opposed efforts to help him improve his judicial and administrative skills.

8. McCabe had been removed from the court in 1985 because he had been found guilty by the Council of charges of malfeasance, misfeasance, and neglect of duty.

9. MacDonald had advocated to his followers earlier that same day that they should make a citizen's arrest on James Stevens, Area Director of the BIA.

The next day MacDonald's supporters retook the Chairman's office and had the locks changed at Benally's direction. At that time, Benally was purporting to be the Temporary Chairman of the Navajo Nation, based on an appointment by his advisory committee acting under MacDonald's direction.

By May 24, 1989, a large group of people had gathered both inside and outside the building. Among those present were Appellants Benally, McKensley, Evangeline Wauneka, Sorrell, and Paul Kinlicheenie. Navajo police arrived again to enforce the court order and evacuate the building. Apparently violence erupted as MacDonald and his supporters were removed. Thereafter, MacDonald and his staff and supporters moved their base of operation to the residence of Willie Keeto, Sr. This became known as Keeto camp.

Sometime in late June or early July, MacDonald held a meeting at his home which was attended by many people, including Appellants McKensley and Benally. During the meeting, MacDonald spoke with former Navajo Police Chief Wilbur Kellogg and asked him what it would take for Kellogg to resume control of the police department. Kellogg responded that he would need a majority of the Council to recognize MacDonald as Chairman and that the court would have to dissolve the Temporary Restraining Order.

On July 4, 1989, MacDonald and his former Special Counsel, Geoffrey Standing Bear,[10] met at MacDonald's house. MacDonald indicated that some of his supporters had approached him with a plan to retake the Administration and Finance Building, and MacDonald now sought Standing Bear's advice. Standing Bear told MacDonald that he believed the plan was impractical and politically wrong, and that MacDonald should reorganize his campaign staff and run for re-election. MacDonald also asked Standing Bear to find out whether members of MacDonald's former command staff who had been terminated would support such a take-over attempt. Standing Bear agreed to see if they would assist.

During this discussion, Native American activist Russell Means arrived at MacDonald's house and joined the meeting. Means indicated that he thought that the suggested plan would be successful in restoring MacDonald to power because it would generate support for MacDonald among the Navajo people. The following day, Means and Benally attempted to make a citizen's arrest of former Area Director of the BIA, James Stevens.

In preparation for carrying out the proposed take-over plan, Benally invited former Chairman of the Navajo Nation Raymond Nakai to speak at a rally at the Shiprock Chapter House on July 18, 1989. MacDonald spoke first at the rally, urging those present to take back the government. During Nakai's speech, which followed MacDonald's, Benally handed Nakai an announcement to read to the audience. It purported to be a letter from the United States Attorney in Phoenix, clearing MacDonald of all charges in the Senate investigation. Nakai questioned the legitimacy of the letter, which had no date, letterhead, or signature. Benally lied to Nakai, assuring him that the letter was legitimate. Based on this assurance, Nakai read the letter to the audience. Next, a vote of support was taken for MacDonald's reinstatement as Chairman. Thereafter, McKensley handed Nakai a second announcement to read, which urged the Navajo people to attend a protest rally in support of MacDonald at Keeto Camp in Window Rock two days later on July 20th.

## 2. The Events of July 20, 1989

Hundreds of people arrived at Keeto camp on July 20th. Throughout the day, various persons spoke to the crowd, including Nakai and Appellant Sorrell, urging the people to take the government back and to take possession of blank checks and signature stamps from the Administration and Finance Building to prevent further spending of funds by the Council. In addition, the letter that Nakai had read to the audience in Shiprock two days earlier was again shown to the crowd.

---

**10.** Standing Bear resigned his position as Special Counsel for the Office of the Chairman on April 11, 1989, because he believed that the March 22nd restraining order issued by Judge Yazzie prevented him from performing functions necessary to his position.

Out of concern that the letter's legitimacy might be challenged, the letter displayed on July 20th was a new photocopy on what purported to be the United States Attorney's Office letterhead, now complete with a signature block. The signature had obviously been photocopied onto the letter from another document.

Early on the morning of July 20th, former police chief Kellogg was summoned to meet with MacDonald, McKensley, and others. Kellogg was falsely informed by McKensley that the Council was meeting in special session at noon that day to reinstate MacDonald as Chairman. McKensley then presented Kellogg a copy of an executive order signed by MacDonald directing Kellogg to resume control of the Navajo police department and to assist in the restoration and transition of MacDonald's government. McKensley also instructed Kellogg to meet with the police department command staff to see if they would be receptive to MacDonald's reinstatement order. Kellogg left to go speak with the acting police chief. Following this meeting, Kellogg reported back to McKensley and MacDonald that the police were not receptive to MacDonald's order. MacDonald responded by requesting Kellogg to try harder and to try to recruit officers from other districts if possible.

Shortly thereafter, Patrick Platero, a former Navajo police officer who had heard about the executive order, arrived at Keeto camp. Platero found MacDonald, Benally, and McKensley conversing among themselves. McKensley stood at a chalkboard, diagramming the Navajo Nation tribal buildings, and indicated which buildings they were most interested in taking over if they had enough support. Benally stood next to McKensley holding wooden clubs in his hands. Platero remained at Keeto camp for approximately thirty minutes.

Kellogg returned to Keeto camp around 3:00 p.m. after meeting with other officers, including Platero. By this time, Kellogg was aware that MacDonald and McKensley had lied about the special Council meeting. Kellogg informed MacDonald and McKensley that the police would not fight one another. McKensley, infuriated, told Kellogg to go to hell, and that they could go ahead with their plans anyway. MacDonald reacted by saying, "Fuck it. We have our own police force."

Platero returned to Keeto camp while Kellogg was speaking with MacDonald and McKensley. Platero reported that he observed MacDonald and Benally in the kitchen, and that Benally had a club in his hands. As Platero left, he also observed McKensley carrying an armload of "sticks."

Soon thereafter, as MacDonald looked on, indicted co-conspirators[11] Johnnie R. Thompson and Seymour Tso unloaded clubs similar to those carried by Benally and McKensley from a van and passed the clubs out to a crowd of twenty to thirty men. These men, whose names were contained in a notebook kept by Appellant Sorrell, comprised the security force for the planned take-over. Sorrell told the security force that Kinlicheenie was their leader and that he knew what to do. Kinlicheenie then proceeded to demonstrate how to use the clubs to fight the police. Kinlicheenie, joined by Thompson and Tso, further instructed the security force that they were first to get Navajo police Lt. Daniel Hawkins, tie him up, throw him in a truck, and bring him back to Keeto camp to use in bargaining with the Interim Council government.

Following the demonstration and instructions by Kinlicheenie, MacDonald, club in hand, addressed the security force. MacDonald drew a map in the dirt indicating that the security force was to approach the building from the north so as not to be observed by the police. MacDonald also told the security force to lead the group of demonstrators to the building, and that the rest of the people would follow. In addition, MacDonald told the security force to get certain papers out of the building.

Thompson, who stood by as MacDonald drew the map and gave his instructions, di-

11. Because thirty-two individuals were named in the original indictment, the District Court divided the defendants into two trial groups. The first group included all Appellants now before this court.

rected the security force to get checks, papers, and Interim Chairman Haskie's signature stamp out of the building. Before leaving Keeto camp, Kinlicheenie announced to the crowd, "Let's go do it. Let's get it over with and make a citizen's arrest on Lt. Daniel Hawkins."

Throughout the day, Lt. Hawkins kept tabs on the activities at Keeto camp, and observed the increasing number of vehicles and people. Lt. Hawkins was aware of the scheduled protest and expected between 150 and 300 demonstrators. Consequently, he called in twenty-five additional officers from other police districts to help keep the demonstration peaceful. Hawkins observed more vehicles then he had ever observed before when he went by Keeto camp at approximately 3:30 p.m. Nonetheless, at about 4:00 p.m. Hawkins began dismissing the additional officers. Hawkins felt that it was safe for the officers to leave because, in the past, all protests had occurred at around noon. Since nothing had happened so far, Hawkins thought there would be no further action that day.

Co-conspirator Edison Wauneka kept watch for police activity around the Administration and Finance Building throughout the day. At one point, Wauneka returned to Keeto camp and reported that the demonstrators should wait because police were present. Later in the afternoon, Wauneka returned again to Keeto camp and told the demonstrators that they should go because the police were no longer at the building. The crowd at Keeto camp prepared to leave. Before doing so, Sorrell called a locksmith in anticipation of changing the locks on the building after it was taken by the demonstrators.

### 3. The Incident

As directed by MacDonald, just before 6:00 p.m. the security force arrived at the north side of the locked Administration and Finance Building, riding in the backs of pick-up trucks with clubs in hand. They were followed by 200 to 300 demonstrators in trucks

and cars. The demonstrators gathered outside the building, shaking its doors in an attempt to get in.

Lt. Hawkins, who had learned that the demonstrators were on their way to the building, arrived from the east in his police car. Hawkins drove first to the police station to secure it, then to the Administration and Finance building. When he arrived, he approached the crowd. The crowd recognized Lt. Hawkins almost immediately as the person whom they were supposed to "arrest." The crowd, which included Appellants McKensley, Earl Roy Lee, John Nez Begay, and Wauneka, descended on Hawkins, and forced him to retreat inside his police car. The crowd battered Hawkins' car with clubs and broke the front and rear windshields. Lt. Hawkins pulled his service revolver, pointed it toward the roof of his car, and attempted to drive away. The crowd poked him with clubs and grabbed at his arms and legs through the open windows, preventing him from leaving. Wauneka was one of those seen wielding a club at Hawkins.

Exhibit 1 at trial was a videotape recorded by Navajo Police Officer Eugene Atcitty which depicted the demonstration and the violence that ensued. Exhibit 105 was an enhanced portion of Exhibit 1, the original videotape of the July 20th incident. Exhibit 105 shows Appellant Begay leaning into the police car as Lt. Hawkins is being grabbed and clubbed. Begay, armed with a club, is holding a rope.

Lt. Hawkins heard the back door of his car being unlocked and opened. Appellant Lee and co-conspirator Emile Benally [12] got into the back seat. Emile Benally restrained Hawkins in a headlock, enabling Appellant Alfred Scott, Sr. to enter the back seat and take Hawkins' revolver out of his hand.

McKensley and Kinlicheenie were among those in the crowd who then dragged Lt. Hawkins from his car. McKensley held Hawkins as others in the crowd tied his legs

12. Emile Benally pled guilty to assaulting Lt. Hawkins and testified for the Government at trial.

with a rope and his wrists with flexicuffs.[13] Begay is the only person seen in the videotape with a rope similar to the one used to restrain Hawkins. Lt. Hawkins was then maced and beaten.

Navajo Police Sgt. Daniel Lee attempted to aid Lt. Hawkins, but was beaten back by demonstrators with rocks and clubs after being pointed out by Appellant Earl Roy Lee. Approximately twenty-five demonstrators, including Appellants Kee Ike Yazzie, Begay, Lee, and unindicted co-conspirator Arnold Begay, chased Lee, hitting him with clubs. Officer Calvin Begay then arrived from the north side of the building, and pulled up next to Lt. Hawkins' car. Although this distracted some of the demonstrators, Arnold Begay and Appellants Lee and Yazzie headed back toward Lt. Hawkins.

Sgt. Lee attempted to radio for additional help, but was prevented from doing so when an unidentified woman stole the police radio from his car. Sgt. Lee watched as a crowd of approximately twenty demonstrators, including Appellants Lee, Yazzie, Sorrell, and Wauneka, attacked Officer Calvin Begay. During the attack, Appellant Lee sprayed mace in Officer Begay's face. Sgt. Lee lost sight of Officer Begay as Begay was chased north by the demonstrators.

His vision blurred by the mace, Officer Begay had trouble clearly seeing the ten to twelve people coming at him with clubs. Although he wanted to draw his weapon and fire, he did not do so because there were women and children nearby. Instead, Officer Begay kept his weapon holstered and attempted to outrun the demonstrators.

Appellant Lee and co-conspirator Arnold Begay, along with other demonstrators, pursued Officer Begay. They eventually caught Officer Begay, and six demonstrators jumped him. Appellant Lee took Officer Begay's gun. Officer Begay was clubbed, kicked, and beaten. Appellant Lee and co-conspirator Arnold Begay handcuffed Officer Begay with his own handcuffs, and they repeatedly maced him and rubbed the mace into his eyes. Officer Begay was also hit in the head

with an aluminum baseball bat with such force that his nose was shattered. One of the demonstrators asked him, "How do you like working for Haskie now?" After someone kicked Officer Begay in the side of the face, Appellant Lee rolled him over and threw him into a ditch.

By this time, additional police had arrived. Officers Smith, Singer, Yazzie, and Greymountain assisted Sgt. Lee in rescuing Lt. Hawkins and carried him into an ambulance. Sgt. Lee then searched for Officer Begay, and instructed other officers to do the same. Sgt. Lee was confronted by Appellant Sorrell, who told him, "You're supposed to be on our side. Come on our side." Ignoring her, Sgt. Lee proceeded toward several police vehicles from which he had heard a distress call over another radio. Officers Smith and Shirley reported that they were on the north side of the building with their guns drawn, but that the demonstrators kept coming. Appellant Wauneka had instructed the demonstrators to shift their attack from the east side of the building to the north side to help in the assaults on the police officers.

When Sgt. Lee arrived on the north side of the building, he observed demonstrators pelting police officers with rocks. As he approached the officers, telling the demonstrators to move back and put down their clubs, Sgt. Lee was attacked by Appellant Lee, who struck the officer several times with a club and said, "We're going to get you. We're going to kill you." Several other officers were similarly attacked.

Officers Greymountain and Singer, and Sgt. Yazzie, arrived at the north side to help the officers who were under attack. Greymountain and Singer were attacked with clubs as they attempted to rescue the other officers. During the melee, co-conspirator Arnold Begay, who was then beating Officer Singer, was shot by Officer Smith. Unindicted co-conspirator Jimmy Dixon, who had taken Officer Singer's revolver, shot Sgt. Lee in the leg. Sgt. Lee returned fire at Dixon and killed him.

---

**13.** Kinlicheenie was instructed how to use flexicuffs at Keeto camp, and he had a pair on his belt when he left the camp with the security force to go to the demonstration. The videotape shows Kinlicheenie with the flexicuffs as he leaned into Hawkins' car.

Shortly after Sgt. Lee was shot, Appellant Sorrell came up to Sgt. Lee and said, "If you came to our side you wouldn't have gotten shot. Look at you now." Appellant Yazzie said, "Let's continue on with our cause. We're going to take our government back."

As the wounded were being tended to on the north side of the building, a portion of the crowd attempted to gain entry into the check-processing room in the Administration and Finance Building. Sorrell led the demonstrators in the chants, "We want Mac-Donald," and "We want our money." An unidentified woman broke the glass in the front door as Appellants Sorrell, Yazzie, Kinlicheenie, and Wauneka, who were part of the group at the front doors of the building, looked on. Oliver Arviso [14] cleared away the excess glass from the door frame with a club so that people could enter. Kinlicheenie stood guard with a club outside the door. He told people that he was security and that he would keep the police out. He urged the people to enter the building to get certain papers.

The crowd proceeded into the check-processing room to get the blank checks and the Haskie signature stamp previously described by MacDonald and others. Oliver Arviso threw a chair through the window of the room to gain entry. Wauneka, who knew where the checks and papers were located, grabbed an empty box and began filling it. The box was placed on a chair with wheels and wheeled out of the building. Wauneka, then standing outside the building, directed others to specific places in the building to get additional papers.

Appellant Yazzie was in the personnel office for approximately thirty minutes, making telephone calls and rifling through drawers, desks, and papers. Appellant Sorrell was also seen in the building with papers in her hands. Further, she was directing others to specific offices and telling them what to look for.

Later that evening, police sealed off the ransacked Administration and Finance Building.

## ANALYSIS

### I. Jurisdictional Issues

Appellants raise scores of issues, both individually and collectively, on appeal. In this opinion, we address Appellants' various challenges to subject matter jurisdiction and one of Appellant Lee's evidentiary challenges.[15]

■ The first issue we address is whether the United States District Court had subject matter jurisdiction over Count 1 of the indictment, i.e., the charge of conspiracy to commit assault and kidnapping under 18 U.S.C. §§ 371, 1153, and 1201(c). We review jurisdictional issues over criminal offenses *de novo*. *United States v. Laughing*, 855 F.2d 659, 660 (9th Cir.1988); *United States v. Walczak*, 783 F.2d 852, 854 (9th Cir.1986).

Appellants argue that the District Court lacked subject matter jurisdiction over the conspiracy charge because federal jurisdiction over criminal matters that occur between Indians in Indian country [16] extends only to those crimes enumerated in the Major Crimes Act, 18 U.S.C. § 1153.[17] Because conspiracy, as defined in 18 U.S.C. § 371, is not an enumerated crime under § 1153, Ap-

**14.** Oliver Arviso pled guilty to burglary and testified for the Government.

**15.** The remaining issues raised by Appellants involve settled questions of law. We therefore address them in a separately filed memorandum disposition, in which we uphold the District Court's rulings. [—— F.3d —— (9th Cir.1994)].

**16.** Appellants and the Government agree that all Appellants are Indians and that all of the events at issue occurred in Indian country.

**17.** The Major Crimes Act, 18 U.S.C. § 1153, provides in part:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

pellants contend that the tribal court must have exclusive jurisdiction over the conspiracy charge. In addition, Appellants argue that the United States District Court lacks jurisdiction over the conspiracy charge because conspiracy is not a law of universal, nationwide applicability, which applies to all persons, Indian or non-Indian, in Indian country or out of it.

■■■ Appellants correctly remind us that Indian tribes are recognized as quasi-sovereign entities that may regulate their own affairs except where Congress has modified or abrogated that power by treaty or statute. *United States v. Burns,* 529 F.2d 114, 115 (9th Cir.1976) (citing *Ex parte Crow Dog,* 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883); *Iron Crow v. Oglala Sioux Tribe of Pine Ridge Reservation,* 231 F.2d 89 (8th Cir. 1956)). Courts have also recognized, however, that regulation of criminal activity in Indian country is one area where competing federal interests may override tribal interests. *United States v. Markiewicz,* 978 F.2d 786, 797 (2nd Cir.1992). To this end, Congress passed various federal enclave laws that permit federal courts to serve as a forum for the prosecution of certain crimes that occur within the special maritime and territorial jurisdiction of the United States, including the Indian country. *Id.* By definition, enclave laws are laws where the situs of the offense is an element of the crime. *United States v. Strong,* 778 F.2d 1393, 1396 (9th Cir.1985).

■■■ To balance the sovereignty interest of Indian tribes and the United States' interest in punishing offenses committed in Indian country, Congress enacted two statutes, 18 U.S.C. §§ 1152 and 1153. Section 1152, known as the Federal Enclave Act, provides in part:

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

> This section shall not extend to offenses committed by one Indian against the person or property of another Indian. . . .

Thus, under § 1152, Congress mandated that the "general laws" of the United States applicable in federal enclaves, such as national parks, military bases, veterans' hospitals, federal buildings, and federal prisons, apply in Indian country, except where the offense charged was committed by one Indian against the person or property of another Indian.

Under § 1153, the Major Crimes Act, Congress partially abrogated § 1152 by extending federal jurisdiction over Indians in Indian country for the commission of thirteen specific "major" crimes. Congress did so even though those crimes might not otherwise be federal offenses if committed by non-Indians outside Indian country.

■■ Our reading of §§ 1152 and 1153 leads us to reject Appellants' contention that Indians may not be charged for *any* criminal conduct beyond those crimes enumerated in § 1153. As we indicated in *United States v. Top Sky,* § 1153, the Major Crimes Act, deals only with the application of federal enclave law to Indians and has no bearing on federal laws of nationwide applicability that make actions criminal wherever committed. 547 F.2d 483, 484 (9th Cir.1976) (Bald Eagle Protection Act, a law of general applicability throughout the United States, applies to Indians even though conduct the Act proscribes is not an enumerated offense under § 1153); *see also Superintendent v. Commissioner,* 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935) (applicability of federal income tax laws); *United States v. Sohappy,* 770 F.2d 816, 820 (9th Cir.1985) (applicability of Lacey Act), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3278, 91 L.Ed.2d 568 (1986); *United States v. Farris,* 624 F.2d 890, 893–94 (9th Cir.1980) (applicability of RICO statute).

■■ Similarly, § 1152 relates "only to federal enclave law—law in which the situs of the offense is an element of the crime." *United States v. Strong,* 778 F.2d at 1396. Section 1152 does not apply to violations of laws of nationwide applicability that constitute federal crimes regardless of where committed. *Acunia v. United States,* 404 F.2d

140, 141 n. 1 (9th Cir.1968).[18]

 There is no doubt that 18 U.S.C. § 371, the conspiracy statute under which the Appellants were convicted, is not a federal enclave law because the situs of the conspiracy is not an element of the offense. Section 371 is a federal criminal statute of nationwide applicability, and therefore applies equally to everyone everywhere within the United States, including Indians in Indian country. As we stated in *United States v. Burns*, 529 F.2d 114, 117 (9th Cir.1975), federal criminal statutes apply to Indians "unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question."

Relying on a Second Circuit case, *United States v. Markiewicz*, 978 F.2d 786 (2nd Cir. 1992), Appellants assert that only those federal criminal statutes of nationwide applicability that reflect a "peculiarly federal" interest apply to Indians in Indian country. Thus, according to Appellants, unless we find that the federal conspiracy statute aims to protect such an interest, we must hold that the statute is inapplicable to conduct between Indians that occurs in Indian country. We reject this argument for several reasons.

First, as the court in *Markiewicz* recognized, "the Ninth Circuit ... has determined that federal criminal laws [of nationwide applicability] apply of their own force to Indian territories." [19] *Id.* at 799 (citing *United States v. Young*, 936 F.2d 1050, 1055 (9th Cir.1991)) (jurisdiction extends to violation of criminal statutes of "general, non-territorial applicability" where an Indian defendant assaulted a federal officer, shipped firearms, and carried a firearm during the commission of another offense); *see also United States v. Burns*, 529 F.2d at 116–17 (federal jurisdiction proper over Indian defendant who violated firearm-possession statute); *Walks on Top v. United States*, 372 F.2d 422, 425 (9th Cir.1967) (federal jurisdiction proper over assault by Indian in Indian country against federal officer who was also Indian; assault of federal officer violates a federal law of nationwide applicability).

Appellants disagree with the Second Circuit's statement in *Markiewicz* concerning the status of Ninth Circuit law. Instead, Appellants look to *United States v. Jackson*, 600 F.2d 1283 (9th Cir.1979), to support their contention that the Ninth Circuit has in the past interpreted § 1153 as enumerating the complete and exclusive list of crimes for which Indians committing crimes in Indian country may be federally prosecuted. Our reading of *Jackson* does not support this view.

 In *Jackson*, the issue before this court was whether an Indian defendant who violated a tribal hunting ordinance could be prosecuted under 18 U.S.C. § 1165, which prohibits hunting on Indian land absent the tribe's permission. As Appellants indicate, in applying federal enclave law we interpret § 1153 narrowly. *Id.* at 1285–86. But *Jackson* does not stand for the proposition that federal laws of otherwise nationwide applicability do not apply in Indian country. Rather, we reversed the defendant's conviction because the federal statute under which he was convicted was intended by Congress to apply not to *everyone* within United States jurisdiction, but rather to everyone *except* Indians. Congress' intent was clear from the legislative history of the statute. *Id.* at 1286–87. Thus, *Jackson* is distinguishable from the present case because the statute

---

18. As noted above, § 1152 (the Federal Enclave Act) imports into Indian country only the "laws of the United States as to punishment of offenses committed in any place within the *exclusive* jurisdiction of the United States." (Emphasis added.) Exclusive United States jurisdiction extends only over such places as national parks, military bases, veterans' hospitals, federal buildings, federal prisons, etc. Thus, the federal enclave laws that apply only within exclusive United States jurisdiction have no bearing on federal laws of nationwide applicability that apply throughout the United States.

19. This approach is also recognized by the Eighth Circuit. *See United States v. Blue*, 722 F.2d 383, 385–86 (8th Cir.1983) (federal jurisdiction over Indian in Indian country for violation of federal narcotics statutes proper); *Stone v. United States*, 506 F.2d 561, 563 (8th Cir.1974) (federal jurisdiction proper where Indian assaulted federal officer who was also Indian in Indian country under "laws of the United States that make actions criminal wherever committed"), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975).

under which the Indian defendant was prosecuted was not truly a federal law of nationwide, universal applicability.

Second, we disagree with Appellants and the Second Circuit in *Markiewicz* that the Supreme Court in *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), determined that the "general laws" referred to in § 1152 require a showing of a "peculiarly federal" interest to be applicable to Indians. The two footnotes (n. 30 and n. 32) in *Wheeler* to which the court in *Markiewicz* refers (*see Markiewicz,* 978 F.2d at 800) do not purport to create such a requirement. *Wheeler,* 435 U.S. at 331, 98 S.Ct. at 1090.[20] Nowhere do these two footnotes state that federal criminal statutes of nationwide applicability are inapplicable to Indians in Indian country unless a "peculiarly federal" interest is shown.

Finally, we disagree with Appellants that the remaining case they cite, *United States v. Narcia,* 776 F.Supp. 491 (D.Ariz.1991), requires us to find that conspiracy as charged in 18 U.S.C. § 371 is not a nationwide law applicable to Indians. In *Narcia,* the court held that the defendants could not properly be federally prosecuted for attempted robbery under § 1153 because that offense is not enumerated in § 1153. In reaching this conclusion, however, the district court did not rely only on the fact that the offense was not listed in § 1153. The district court stated that an attempt could not be charged against the defendants because "there is no general federal statute proscribing an attempt." *Id.* at 493. Thus, the district court's decision in *Narcia,* although not binding, is nonetheless distinguishable and does not conflict with existing Ninth Circuit law nor with our ruling today.

 In Count 1 of the indictment, Appellants were charged with conspiring to commit assault and kidnapping under 18 U.S.C. §§ 371, 1153, 113(b), (c), (f), and 1201(a). Based on existing Ninth Circuit law, we find that the District Court had jurisdiction over the conspiracy count because the conspiracy statute, 18 U.S.C. § 371, is a statute of nationwide applicability. Ninth Circuit law clearly allows Indians to be charged under federal criminal statutes of nationwide applicability if the charge is not otherwise affected by federal enclave law (*e.g.,* the Major Crimes Act, § 1153), or if Indians have not been particularly excluded, either expressly or impliedly, from the statutes' application (*see, e.g., supra, United States v. Jackson,* 600 F.2d at 1286–87). As shown above, the federal conspiracy statute is not affected by federal enclave law, nor does it exempt Indians from its application. We therefore find that the District Court had jurisdiction over the conspiracy charge in Count 1.

This holding leads us also to reject Appellants' related contentions regarding jurisdiction. Kinlicheenie, Lee, McKensley, and Yazzie argue that, assuming the District Court lacked subject matter jurisdiction over the conspiracy charged in Count 1, their individual kidnapping, robbery, and burglary convictions must be reversed because the *Pinkerton* instruction given to the jury by the District Court allowed them to be convicted because of the actions of their co-conspirators.

We reject the argument that the substantive counts should be reversed based on lack of jurisdiction over Appellants Kinlicheenie, Lee, and McKensley because, as set forth above, we find that the District Court had jurisdiction over the conspiracy charge. Moreover, the record indicates that the jury carefully considered each separately charged offense against each Appellant. This is evi-

**20.** Footnote 30 in *Wheeler* states:
 Federal jurisdiction also extends to crimes committed by an Indian against a non-Indian which have not been punished in tribal court, 18 U.S.C. § 1152 (1976 ed.); see n. 21, *supra,* and to crimes over which there is federal jurisdiction regardless of whether an Indian is involved, such as assaulting a federal officer, 18 U.S.C. § 111 (1976 ed.). *Stone v. United States,* 506 F.2d 561 (CA8).

Footnote 32 in *Wheeler* states:
 Moreover, since federal criminal jurisdiction over Indians extends as well to offenses as to which there is an independent federal interest to be protected, see n. 30, *supra,* the Federal Government could be deprived of the power to protect those interests as well.
435 U.S. at 331, 98 S.Ct. at 1090.

denced by the fact that the jury did not convict Appellant Lee of the conspiracy charge. The facts presented at trial indicate that there was sufficient evidence upon which the jury could reach the verdicts that they did on each count as to each Appellant.

■ Next, Appellant Benally asserts [21] that the District Court lacked subject matter jurisdiction because the Government failed to establish at trial, as a predicate to jurisdiction, that the Navajo Indian Reservation is within the "Special Maritime and Territorial Jurisdiction of the United States," as defined in 18 U.S.C. § 7.[22]

■ Benally's contention assumes that the conspiracy charge requires proof that the offense occurred in the "Special Maritime and Territorial Jurisdiction of the United States." This assumption is incorrect. Count 1 charged a conspiracy under 18 U.S.C. § 371 whose objects constituted offenses in Indian country in violation of § 1153. Thus, the Government need only show that the underlying offenses which were the objects of the conspiracy occurred in Indian country.

■ Section 1151 extends federal jurisdiction to "Indian Country." Section 1153 extends exclusive federal jurisdiction over the offenses defined therein that are committed by an Indian against an Indian in Indian Country. Because there is no dispute that the offenses for which Appellants were convicted occurred in Indian Country, we find that all jurisdictional requirements were properly established by the Government at trial.

Finally, Appellant MacDonald argues that the District Court erred in failing to dismiss Count 1 of the indictment on grounds of "duplicity" because the evidence presented at trial indicated either the existence of multiple conspiracies or that Count 1 does not charge a single offense. MacDonald alleges that there was no single conspiracy, but instead "a myriad of actors, acting at different times in the pursuit of numerous and divergent goals."

■ We review the sufficiency of an indictment *de novo*. *United States v. Dischner*, 974 F.2d 1502, 1518 (9th Cir.1992). We look to the indictment itself to determine whether it may fairly be read to charge a single crime in each count. *United States v. Morse*, 785 F.2d 771, 774 (9th Cir.), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2925, 91 L.Ed.2d 553 (1986). An indictment charging conspiracy to commit more than one offense is not duplicitous. *United States v. Smith*, 891 F.2d 703, 712 (9th Cir.1989), *cert. denied*, 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990).

■ We reject MacDonald's contention. We find no error in the indictment, which alleged a conspiracy "to commit violations and offenses against the United States" in violation of 18 U.S.C. §§ 1153 & 113(b), (c), (f), assault; 18 U.S.C. §§ 1153 & 1201(a), kidnapping; and § 1153 and Arizona Revised Statutes, § 13–1506, burglary. The question whether a single conspiracy, rather than multiple conspiracies, has been proved is a question of sufficiency of evidence. *United States v. Bibbero*, 749 F.2d 581, 586 (9th Cir.1984), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985). *See also United States v. Arbelaez*, 719 F.2d 1453, 1458 (9th Cir.), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1983). We find, based on the evidence presented at trial, that a reasonable jury could have found that the goals, methods, and conduct of the convicted co-conspirators were sufficient to establish the conspiracy as charged in the indictment.

21. Although Benally did not raise this issue at trial, lack of subject matter jurisdiction may be raised for the first time on appeal. *United States v. Durham*, 941 F.2d 886, 892 (9th Cir.1991).

22. Benally raises on appeal two additional issues which are derivatively based on this argument. First, Benally contends that the District Court erred in denying his motion for judgment of acquittal based on the Government's failure to prove jurisdiction. Further, Benally argues that the District Court failed to give a proper jury instruction which stated that the jury must find that the charged offenses took place within the "Special Maritime and Territorial Jurisdiction of the United States." Because we reject Benally's foundational argument, we likewise reject these derivative arguments.

## II. Admission of Enhanced Videotape

The remaining issue we address in this opinion is Appellant Lee's contention[23] that the District Court erred in admitting the testimony of Navajo Police Officer Stewart Calnimptewa, who narrated the events depicted in Exhibit 105, an enhanced portion of Exhibit 1, the original videotape of the July 20th incident.[24] Exhibit 1, which was recorded by Officer Eugene Atcitty, depicted the actions of about 200 of the demonstrators and the ensuing violence. We review a district court's ruling on admission of evidence for abuse of discretion. *United States v. Childs,* 5 F.3d 1328, 1332 (9th Cir.1993).

Officer Calnimptewa, aided by a magnifying glass, reviewed Exhibit 1, the original videotape, over 100 times and reviewed about 800 photographs taken during the July 20th incident. Calnimptewa also had portions of the videotape copied in slow motion and their quality enhanced to help his identification of the demonstrators and their actions during the incident. This enhanced portion became Exhibit 105. In Exhibit 105, the tape speed was slowed by 50 percent and color-coded circles and arrows were added to aid the jury in tracing the movements of each of the identified Appellants.

Defense counsel did not challenge the accuracy of Calnimptewa's identification of those depicted in the videotape. The District Court reviewed Exhibit 105, and considered objections raised by defense counsel that the videotape was cumulative and unduly prejudicial. The District Court then ruled that the videotape would be helpful to the jury and admitted it into evidence as Exhibit 105. The District Court, however, admitted Exhibit 105 on condition that the circles and arrows added to the videotape would be explained by a witness who would be subject to cross-examination. Consequently, Calnimptewa narrated the events depicted in the videotape while the jury viewed it at trial.

On appeal, Lee contends that Calnimptewa was not qualified to present testimony about the videotape on two grounds. First, Lee maintains that Calnimptewa's "expert" testimony was improper under Fed. R.Evid. 602 because Calnimptewa lacked personal knowledge of the events depicted in the videotape. Second, Lee maintains that Calnimptewa's testimony was unfairly prejudicial because it was cumulative and invaded the province of the jury.[25] We reject these arguments.

Contrary to Lee's assertion, Calnimptewa's testimony was not admitted as expert testimony under Fed.R.Evid. 702, but as opinion testimony by a lay witness. Fed.R.Evid. 701, which proscribes lay witness opinion testimony, states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Thus, under Rule 701, Calnimptewa's testimony was admissible if the District Court found that it was rationally based on his own perceptions and that the testimony would help the jury. Lee argues that the District Court erred because Calnimptewa's testimony was not based on his own perceptions because he was not present at the July 20th incident. This contention lacks merit.

Calnimptewa's perceptions need not be based on the "live" events of July 20th because he was not testifying to his eyewitness account of those events. Calnimptewa's testimony concerned only the scenes depicted in Exhibit 105 as extracted from Exhibit 1, the original videotape. Thus, Calnimptewa need only have perceived the events depicted in Exhibit 1.

23. Lee is the only Appellant raising this issue on appeal.

24. The videotape itself has no soundtrack. On appeal the trial court's rulings on the admissibility of Exhibits 1 and 105 are not challenged.

25. Lee does not specifically object to the admission of Calnimptewa's testimony under Fed. R.Evid. 403. However, we consider a claim that evidence is cumulative or unfairly prejudicial under the balancing standard set forth in Rule 403, i.e., whether the dangers of unfair prejudice outweigh the evidence's probative value.

We believe that the District Court correctly ruled that Calnimptewa had sufficient personal knowledge to testify about Exhibit 105 because his testimony was based on his own perceptions of Exhibit 1, the original videotape. Fed.R.Evid. 602, which prescribes the personal knowledge requirement for witnesses, states in pertinent part:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.

Under this standard, we find that Calnimptewa had sufficient knowledge to testify about the contents of Exhibit 105, based on his extensive review of Exhibit 1. Thus, we reject Lee's contention that Calnimptewa lacked the personal knowledge to testify.

Moreover, we agree with the District Court that Calnimptewa's testimony about Exhibit 105 was likely to have been helpful to the jury in evaluating Exhibit 1. Although the jury viewed Exhibit 1 in its entirety, it is reasonable to assume that one viewing a videotape of a demonstration involving over 200 people would likely not see certain details, given the tremendous array of events all occurring simultaneously. Officer Calnimptewa spent over 100 hours viewing Exhibit 1. To have the jury do likewise would be an extremely inefficient use of the jury's and the court's time. Therefore, Calnimptewa's testimony concerning which persons were engaged in what conduct at any given moment could help the jury discern correctly and efficiently the events depicted in the videotape.

Next, we consider Lee's contention that, even if Calnimptewa's testimony were admissible, the testimony was unfairly prejudicial because it was cumulative and invaded the province of the jury. At the outset, we reject the notion that Calnimptewa's testimony constituted a "needless presentation of cumulative evidence" under Fed.R.Evid. 403. As indicated above, we find that the District Court correctly determined that Calnimptewa's testimony would help the jury focus its attention on critical events depicted in Exhibit 1.

Further, we reject Lee's suggestion that Calnimptewa's testimony improperly invaded the province of the jury because his narration included opinions on critical facts and supported only the Government's version of the events on July 20th.

Lee maintains that allowing Calnimptewa to testify, in essence, provided the Government the opportunity to present legal argument from the witness stand, as opposed to proper argument by counsel from the podium. Lee is incorrect. Calnimptewa's narration of Exhibit 105 involved a factual explanation of enhanced portions of Exhibit 1. He did not offer arguments or conclusions concerning the actions of those depicted in the videotape.

Moreover, we do not believe that Calnimptewa's testimony invaded the province of the jury. Calnimptewa was subject to extensive cross-examination by defense counsel. Appellants had every opportunity to present evidence to contradict Calnimptewa's testimony. It was thus properly left to the jury to draw its own conclusions regarding the weight of the evidence presented.

Therefore, the District Court did not abuse its discretion in allowing Calnimptewa's testimony.

AFFIRMED.

